[Civ. No. 39469. First Dist., Div. Two. Mar. 23, 1977.]

WILLIAM S. CLARK et al., Plaintiffs and Appellants, v. JAY PATTERSON et al., Defendants and Respondents; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 6 et al., Interveners and Respondents.

**COUNSEL**

Dobbs, Doyle & Nielsen, James R. Parrinello, Vigo G. Nielsen, Jr., and Thomas H. Crawford for Plaintiffs and Appellants.

Thomas M. O'Connor, City Attorney, James J. Stark and Burk E. Delventhal, Deputy City Attorneys, for Defendants and Respondents.

Jerome M. Garchik, Neyhart & Anderson and Brundage, Beeson & Pappy for Interveners and Respondents.

OPINION

**TAYLOR, P. J.**—W. S. Clark and several other taxpayers (hereafter taxpayers) and voters of the City and County of San Francisco (hereafter City), appeal from an order dated May 13, 1976, denying their petition for a writ of mandate. They contend that the removal of two propositions by Patterson, acting registrar of voters (hereafter registrar), from the June 8, 1976, primary election ballot, at the direction of the City's governing body prior to the election, was improper and violated the integrity of the electoral process. ■ Although the particular election is past, the precise legal questions presented are matters of first impression, which are of continuing public interest, are likely to recur in future elections and, accordingly, are not moot (*Hardie* v. *Eu,* 18 Cal.3d 371, 379 [134 Cal.Rptr. 201, 556 P.2d 301]; *Knoll* v. *Davidson,* 12 Cal.3d 335, 344 [116 Cal.Rptr. 97, 525 P.2d 1273]; *Green* v. *Superior Court,* 10 Cal.3d 616, fn. 6, at p. 622 [111 Cal.Rptr. 704, 517 P.2d 1168]). For the reasons set forth below, we disagree with the contentions of the taxpayers and affirm the order.

The parties agree that the pertinent facts are accurately summarized by the taxpayers' opening brief, as follows: On March 8, 1976, the City's governing body, the board of supervisors (hereafter Board), culminated a month of public debate concerning the right of City employees to strike by unanimously voting to place a proposed charter amendment, Proposition E, on the June 8, 1976, primary election ballot; this measure prescribed disciplinary action against striking employees.

On April 15, 1976, in the midst of a prolonged public employees' strike, eight members of the Board invoked their initiative powers, pursuant to the City charter, to submit to the voters a proposed ordinance change, Proposition K, on the June 8, 1976, primary election ballot; this measure permitted the Board to adopt a two-year compensation schedule for specified City employees.

Prior to May 8, 1976, Propositions E and K were included in the City voter handbook, printed on absentee ballots, and printed on sample ballots. In addition, taxpayers expended approximately $1,000 for campaigns in support of Propositions E and K, including the printing in the voter handbook of an argument in support of Proposition E.

On Saturday, May 8, 1976, a majority of the Board entered into an agreement with representatives of the striking employees to facilitate a

strike moratorium. Partial consideration for the agreement was the promise of the Board members to withdraw Propositions E and K from the June 8, 1976, ballot. By resolution, approved by eight members of the Board, the registrar was directed to withdraw Proposition E from the ballot. Simultaneously, the same eight members of the Board sent a letter to the registrar requesting that their names be withdrawn from the initiative ordinance placing Proposition K on the ballot.

The following day, Sunday, May 9, the taxpayers initiated the instant proceedings to prevent the registrar from taking any action to prevent the voters from casting votes on Propositions E and K. On Monday, May 10, 1976, at 8 a.m., absentee voters began to cast votes on Propositions E and K. On May 12, 1976, the court granted the petition to intervene of several labor organizations that represented the City's employees with regard to wages, hours and conditions of employment (hereafter interveners). On May 13, 1976, the court denied the taxpayers' petition for a writ of mandate and thereafter the absentee votes on the two propositions were not counted, and the two measures were not submitted to the voters at the primary election of June 8, 1976. This appeal was filed on May 14, 1976.[1]

The record indicates that Proposition E, a proposed charter amendment, was approved by the City's Board by a unanimous vote at the Board's regularly convened meeting on March 8, 1976, pursuant to Government Code section 34459 (set forth, so far as pertinent, below).[2] Proposition K, a proposed initiative ordinance, was placed on the ballot by the signing of a petition of eight board members, pursuant to section 9.108 of the City charter (likewise set forth below, so far as pertinent).[3]

[1]The order did not become final until May 27, 1976, when the state Supreme Court denied the taxpayers' petition for a hearing. A copy of the May 13 order refiled on that date and designated Exhibit "E" is the subject of the City's motion to augment the record on appeal; as the augmentation is mere surplusage, the motion is denied.

[2]"The charter of any city may be amended or repealed by proposals submitted by the governing body *on its own motion* or by petition signed by 15 percent of the registered electors, or both." (Italics supplied.)

[3]"Any such ordinance [which the Board is empowered to pass] may be proposed by *one-third of the supervisors* . . . and when so proposed shall be submitted to the electors at the next succeeding general election." (Italics supplied.)

In addition to the power set forth in charter section 9.108, the Board is also empowered to submit ordinances to the voters under Elections Code section 3750, which provides: "The board of supervisors may submit to the voters, without a petition, an ordinance for the repeal, amendment, or enactment of any ordinance. The ordinance shall be voted upon at any succeeding regular or special election, and if it receives a *majority* of the votes cast, the ordinance shall be repealed, amended, or enacted accordingly." (Italics supplied.)

Thus, it is readily apparent that none of the specific provisions (quoted below) pursuant to which the Board formulated and placed the two propositions on the ballot discuss the procedure for, and proper timing of, the Board's withdrawal of propositions.

■ The first question presented is whether the Board, after deciding to submit Propositions E and K to the electorate, can subsequently rescind its action. While there is no authority precisely in point, we agree with the court below that the guiding principle is stated in *McConoughey* v. *Jackson,* 101 Cal. 265 [35 P. 863]. *McConoughey* held that ". . . the legislative department of a municipal corporation . . . may at any time before the rights of third persons have vested, if consistent with the law of its creation and its rules of action, rescind previous votes and orders." It seems self-evident that this rule of law merely enunciates what common sense dictates. Legislative bodies, no less than private individuals or commercial entities, require a measure of flexibility in their dealings and transactions. They, acting as representatives of the people, must have the ability to undo what they have done, given compelling circumstances.

Accordingly, we conclude that the Board here had an implied power to withdraw Propositions E and K from the ballot.[4] We believe that such an implied power is necessary, as a Board action which was reasonable and necessary when taken, may become unnecessary and harmful by the time of the election for reasons not readily apparent to the electorate.

■ The taxpayers, however, maintain that in the withdrawal of Proposition E, the charter amendment, the Board did not follow its own procedures, as the withdrawal constituted a "legislative action," taken pursuant to section 2.300 of the City charter.[5] That charter provision states, so far as pertinent: "Action by the board of supervisors shall be by ordinance or resolution in writing introduced by a member or by a committee of said board and passed or adopted by a majority of all the

---

[4]We note that this conclusion can also be supported by an analogy to the law applicable to candidates. Absent a statutory provision to the contrary, the common law rule is that a person who declares himself a candidate has an implied power to withdraw his name. *Bordwell* v. *Williams,* 173 Cal. 283 [159 P. 869], so held at page 287, when the applicable law only prohibited the withdrawal of a candidate nominated in the primary election. The *Bordwell* rule was subsequently altered by the enactment of Elections Code section 6650.

[5]We can take judicial notice of the language of this and other charter provisions not set forth in the record (Evid. Code, § 452, subd. (b); *Thompson* v. *City of Los Angeles,* 82 Cal.App.2d 45 [185 P.2d 393]).

members of the board at each reading. Every legislative act shall be by ordinance." The section then spells out the specific procedures for the passage of ordinances that the taxpayers claim were not followed in the withdrawal of Proposition E.

We find persuasive the City's contention that the term "legislative act," as used in section 2.300 of the charter, refers only to ordinances or resolutions that must be submitted to the Mayor, who may either veto or approve them. In contrast, proposals (like Proposition E) submitted to the voters by the Board become effective immediately, and the Mayor has no power either to repeal or sign such a submission.

Furthermore, we do not think that the charter could require the motions of the Board for the submission of proposed charter amendments and ordinances to the voters to be first sent to the Mayor for his action, since the procedure for amending charters originally was specified in the state Constitution and then moved to Government Code section 34459. We think the statute containing the language previously found in the Constitution exclusive and controlling. ■ Statutes not inconsistent with constitutional provisions are given binding and co-equal effect (cf. *Uhl* v. *Collins,* 217 Cal. 1 [17 P.2d 99, 85 A.L.R. 1370]; *Garver* v. *Council of City of Oakland,* 96 Cal.App. 560 [274 P. 375]).[6]

Furthermore, section 13 of article XI of the Constitution, as revised in 1970, and so far as here pertinent, provides: "The provisions of Sections 1(b) (except for the second sentence), 3(a), 4, and 5 of this Article relating to matters affecting the distribution of powers between the Legislature and cities and counties, including matters affecting superses-

---

[6]We note that prior to 1970, the power of the Board to prepare charter amendments, as originally stated in article XI, section 8, subdivision (h) of the state Constitution, provided: "The charter of any city or city and county may be amended by proposals therefor submitted by the legislative body thereof *on its own motion* or on petition signed by 15 percent of the registered electors, or both." (Italics added.) Thus, there was no mention of executive officer approval or veto. The language of the former constitutional provision "on its own motion" is precise and unequivocal. Although the above terms were eliminated by the June 2, 1970, amendment to section 8, subdivision (h), this was part of a general constitutional revision and streamlining. As so amended in 1970, article XI now provides in section 3, subdivision (b): "The governing body or charter commission of a county or city may propose a charter or revision. Amendment or repeal may be proposed by initiative or by the governing body."

That the elimination of the phrase "on its own motion" was not intended as a substantive change was indicated by the legislative counsel's analysis accompanying the 1970 constitutional amendment, stating that the subject matter of the deleted provisions is placed under legislative control through the enactment of statutes. Chapter 1264 of the Statutes of 1969 (Gov. Code, § 34459) is such a statute.

sion, shall be construed as a restatement of all related provisions of the Constitution in effect immediately prior to the effective date of this amendment, and as making no substantive change."

"The terms general law, general laws, and laws, as used in this Article, shall be construed as a continuation and restatement of those terms as used in the Constitution in effect immediately prior to the effective date of this amendment, and not as effecting a change in meaning."

A fair reading of Government Code section 34459 compels the conclusion that the Board is vested with the power "*on its own motion*" to submit proposed charter amendments to the electorate for its approval or disapproval. We can only conclude that the submission of Proposition E by the Board was not a legislative action, within the meaning of charter section 2.300. Our conclusion is further reinforced by the fact that there is no mention anywhere in the charter of the constitutional power of the Board to submit proposed charter amendments to the voters.

The taxpayers' contention has even less merit as to the Board's initiative process used for Proposition K. As to the question here presented, we see no difference between E and K. The taxpayers' attempts to analogize the Board's exercise of its initiative powers to an initiative submitted by the voters or protests filed by the taxpayers is entirely inapposite.

The next question presented is whether the Board's action interfered with the electoral process. The taxpayers argue that this question must be answered in the affirmative. They first contend that under the holding of *Uhl* v. *Collins,* 217 Cal. 1 [17 P.2d 99, 85 A.L.R. 1370], their right to vote vested as soon as the two propositions were submitted to the registrar. We cannot agree.

*Uhl* involved a charter amendment submitted by a petition of electors pursuant to former state Constitution article XI, section 8, quoted above at footnote 6, page 335. Prior to the verifications of the signatures, a large number of signers asked the registrar to withdraw their signatures. It was conceded that if these signatures had been withdrawn as requested, the petition would fail. In the light of these facts, our Supreme Court held (at p. 3), that the signers could not withdraw their names or have their signatures withdrawn "at any time after the petition has been filed" with the registrar. The court explained its reasoning, as follows, at page 4: "On principle, it seems clear that the elector whose name is placed upon

a petition through fraud, inadvertence or upon insufficient reflection should not be irrevocably bound by the mere signing, but should be permitted to correct his error and assume his true position with regard to the proposed measure if this can be done without injury to the initiative system. But if the alleged right of withdrawal, based upon change of mind, is to be exercised to the destruction of the initiative procedure, then we may well question its justification. In order to accomplish anything, the proponents of a measure must be able to rely upon signatures obtained, and if continually forced to seek new ones to take the place of withdrawals, may never be able to prepare a proper petition within the limited period which usually exists. To permit withdrawals after the petition is completed and filed, and the work of securing signatures abandoned, seems to us to make the system wholly unworkable. We do not believe that this mere implied power of the signer,which is not expressly provided for in our Constitution or statutes, can be used so as to jeopardise the exercise of the constitutional right itself. The cases which limit the right of withdrawal to the period before filing seem to us to reach the proper conclusion, which gives a reasonable time for reconsideration to the signer, and also protects the petition when completed and turned over to the proper authorities."

In the instant case, unlike the initiative petition where a large number of potential signers would have to be solicited in the event of withdrawals, no prejudice can be suffered, as all of the potential parties who participated in the submission and withdrawal are the members of the Board, a small number of persons easily identified, and all have participated in all of the procedures up to the date of the election.[7] As noted in 27 A.L.R.2d 604, 607, among the relevant factors to be considered in a determination of whether persons are to be allowed to withdraw signatures from initiative petitions are: 1) justice to one who has changed his mind; 2) justice to the signers who have not changed their minds; 3) justice to the public; 4) convenience to the public officers and bodies who must act on the petitions; and 5) whether the purpose of the statutory or constitutional provisions authorizing the petitions will be frustrated or furthered.

As to the first factor, clearly justice was done here to those who changed their minds, i.e., the sponsoring supervisors. However, we consider this factor rather insignificant where the persons are elected

---

[7]These factors distinguish the instant case from *Strauss* v. *Board of Supervisors,* 181 Cal.App.2d 133 [5 Cal.Rptr. 294], which followed the *Uhl* rule for the reasons quoted above.

public officials exercising official powers delegated to them by the electorate.

The second factor is not relevant to the instant situation. There is no opportunity for the dissenting Board members to seek other proponents, as no one else was empowered to exercise the decision-making power that was revoked in the instant case. The two supervisors who dissented from the eight to two vote[8] can hardly claim that they have suffered a prejudice because they have been overruled. Without the assent of at least two other Board members in the case of the ordinance and four other Board members in the case of the charter amendment, the propositions could never have been submitted. If the right to withdrawal exists, prejudice can hardly be claimed merely because of the exercise of that right.

As to the third factor of public interest, we are concerned not only with the public interest in an abstract ballot initiative. In the instant case, the elected representatives of the people sought to exercise their sovereign powers ipso facto acting in the public interest. They determined for various reasons that by the time of the election the public's interest was best served by the removal of these ballot measures, just as they had earlier determined that the public interest required submission of E and K to the electorate.

The fourth factor, the convenience of the public officer who must act on the petitions, is also negligible. Here, the registrar was the only public officer affected. Furthermore, any inconvenience to the civil servants was imposed by elected officials rather than by a private citizen. Also, it cannot be argued that the voters were inconvenienced, since they are not required to consider and act upon the propositions until the election begins and the right to vote becomes vested. We think that the trial court reached the only proper and logical conclusion that the election began and the right to vote vested on May 10, when the absentee voters were permitted to cast their ballots. If, as here, the propositions are removed prior to the vesting date of the right to vote, there is no inconvenience to the voters.

We have previously discussed the fifth factor, which deals with frustrating or furthering the statutory provisions authorizing the two ballot propositions. As indicated above, the particular provisions involved necessarily contain an implied power to withdraw by the Board,

---

[8]One supervisor was absent.

the same limited group of public officials who initially invoked the process. It follows that since the propositions were withdrawn prior to the vesting of the right to vote, there is no merit to the taxpayers' interference with the electoral process on this basis. A rule disallowing the withdrawal under the circumstances here would clearly result in the frustration of the Board's power pursuant to Government Code section 34459, charter section 9.108 and Elections Code section 3750.

Finally, we turn briefly to the taxpayers' contentions that there was an improper interference with the integrity of the electoral process, as they had expended funds in furtherance of Proposition E and time in organizing groups to support its passage, and, more importantly, detrimentally relied on the Board's initial action and, therefore, had refrained from exercising their own initiative powers to place the two propositions on the ballot. Both of these contentions are entirely without merit in the instant case. An analogy based on contract law is totally inapposite. The taxpayers' voluntary expenditure of funds in a political campaign, despite its recognized significance (*Buckley* v. *Valeo,* 424 U.S. 1, 13-14 [46 L.Ed.2d 659, 684, 96 S.Ct. 612]), creates no vested right to vote on a particular measure prior to the beginning of the election. If the taxpayers had wished to make certain that Propositions E and K came before the electorate, they could have exercised their rights to petition the registrar to do so, and after proper certification of the signatures, the measures could not have been removed from the ballot[9] (City charter, § 9.109). As stated above, the power to initiate implies the power to withdraw. If the taxpayers see the need for an earlier date for withdrawal by the Board or vesting of the right to vote, they are free to seek the necessary legislative changes. We conclude that the Board's action in withdrawing Propositions E and K before the election did not in any way interfere with the electoral process or deprive the taxpayers of any vested rights.

The City's motion to augment the record is denied. The order appealed from is affirmed.

Kane, J., and Rouse, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 19, 1977.

---

[9]We note there is no showing in the record that they had taken any steps to do so.