606 A.2d 1060

**Robin FICKER et al.**

v.

**Robert DENNY.**

**No. 62, Sept. Term, 1990.**

**Court of Appeals of Maryland.**

Order Aug. 29, 1990.

Opinion June 5, 1992.

Chasanow, J., dissented with opinion in which Rodowsky, J., joined.

David B. Saslaw, Rockville, for petitioners.

Norman G. Knopf, Washington, D.C., for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE and CHASANOW, JJ., and HARRY A. COLE * and WILLIAM H. ADKINS,** Associate Judges of the Court of Appeals (retired).

---

* Cole, J., now retired, participated in the hearing, conference and decision of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the adoption of this opinion.

** Adkins, J., now retired, participated in the hearing, conference and decision of this case while an active member of this Court but did not participate in the adoption of this opinion.

**628**

PER CURIAM.

Upon consideration of the petition for a writ of certiorari to the Court of Special Appeals, in the above entitled case, it is this 29th day of August, 1990

ORDERED, by the Court of Appeals of Maryland, that the petition be, and it is hereby, granted and a writ of certiorari to the Court of Special Appeals shall issue and said case shall be transferred to the regular docket as No. 62, September Term, 1990.

For reasons to be stated in an opinion later to be filed, a majority of the Court concurring, the judgment of the Circuit Court for Montgomery County is hereby vacated and the case is remanded to that court with directions that it enter a judgment for the Petitioners requiring that the referendum petitions be filed and verified in accordance with the provisions of Article XI-A of the Constitution of Maryland and Maryland Code (1986) Repl.Vol., Article 33. Costs to be paid by the Respondent. Mandate to issue forthwith.

ELDRIDGE, Judge.

The issue presented by this case is whether the sponsors of a petition for a county charter amendment, pursuant to Art. XI-A, § 5, of the Maryland Constitution, ordinarily must file the petition once the requisite number of 10,000 signatures have been obtained.[1] This opinion sets forth the

---

1. Article XI-A, § 5, of the Constitution of Maryland provides:

   "Amendments to any charter adopted by ... any County of this State under the provisions of this Article may be proposed by ... the Council of the County, or by a petition signed by not less than 20% of the registered voters of the City or County, provided, however, that in any case *10,000 signatures shall be sufficient to complete a petition. A petition shall be filed with ... the President of the County Council. An amendment so proposed shall be submitted to the voters* of the ... County at the next general or

rationale behind the Court's order issued on August 29, 1990, requiring the Chairman of the organization, Fairness in Taxation, to submit a petition for a proposed charter amendment to the President of the Montgomery County Council.

In response to rising real property taxes in Montgomery County, the political organization Fairness in Taxation ("FIT") was formed. A non-profit, non-partisan organization, FIT sought to cap the increase in real property taxes permitted in a given year and to compel the Montgomery County Council to find alternative sources of revenue. To achieve these ends, FIT launched a petition drive pursuant to Art. XI–A, § 5, of the Maryland Constitution, to amend the Montgomery County Charter. The petition was designed to place a proposed amendment on the ballot which would have limited the percentage of the County's Operating Budget derived from real property taxes to no greater than 37% and which would have capped the percentage increase in real property tax revenue in any given year to 75% of the rate of inflation. In the instructions distributed with the petition to the circulators, FIT stated:

> "4. With enough signatures, the proposed Charter Amendment will be submitted to the voters in the November elections."

According to FIT, approximately 12,500 signatures were obtained in support of placing the proposed amendment on the ballot.

After the requisite number of signatures were obtained, but before FIT filed the petition with the President of the Montgomery County Council, leaders of FIT met with the

---

congressional election occurring after the passage of the resolution or the filing of the petition. If at the election the majority of the votes cast for and against the amendment shall be in favor thereof, the amendment shall be adopted and become a part of the charter of the ... County from and after the thirtieth day after said election...." (Emphasis added).

Council and agreed upon a compromise charter amendment to be submitted to the voters for approval. This amendment would have limited the annual increase in real property tax revenue to 100% of the rate of inflation. Robert Denny, chairman of FIT, announced that FIT would not be submitting the petition which it had circulated but instead that FIT intended to support the County Council's proposed charter amendment.[2]

Several signers of the petition brought suit in the Circuit Court for Montgomery County, against Robert Denny as Chairman of FIT, to compel Mr. Denny to submit the petition. They relied upon the language of Art. XI–A, § 5, of the Constitution. According to the plaintiffs, a petition is "complete" when the requisite number of signatures are obtained, and once a petition is complete, it "shall be filed with the President of the County Council" and "shall be submitted to the voters." The plaintiffs asserted that FIT could not unilaterally decide to withhold the petition and that the Chairman of FIT had a duty to the signers of the petition to file it.

Mr. Denny argued that he had no obligation to file the petition, that the County Council's proposed amendment constituted changed circumstances that relieved him of any obligation to file, that a substantial number of signers no

---

2. The press conference announcing this compromise was jointly held by the County Council members proposing the compromise amendment and Mr. Denny. Mr. Denny announced that FIT would support the Council's amendment, but stated that the 12,000 plus signatures would be guarded as an "insurance policy." Apparently it was intended that the compromise proposed amendment would be placed on the ballot along with a petition amendment which had already been certified. The sponsor of that petition is one of the plaintiffs in this case, Robin Ficker. His proposed amendment would bar the County Council from raising the tax rate above its fiscal 1988 level. The compromise between the Council and FIT apparently was an attempt to avoid any confusion that would result from multiple tax measures on the ballot. *See, however, Monplaisir v. Katz,* 26 A.D.2d 804, 805, 273 N.Y.S.2d 839, 841, *aff'd sub nom. Cassese v. City Clerk of New York,* 18 N.Y.2d 813, 275 N.Y.S.2d 523, 222 N.E.2d 389 (1966) ("Electors have the right to vote on validly submitted propositions even if confusion may be a consequence").

longer supported the petition, and that the juxtaposition of the petition amendment and the County Council amendment would cause confusion that would split the vote and leave Montgomery County with no tax reform in place.

In addition, according to the defendant, requiring the organization to file the petition would deprive many signers of the right to withdraw their names from a petition which they no longer supported. The defendant, however, provided no evidence that more than 2,500 signers withdrew, attempted to withdraw, or desired to withdraw their signatures.[3] In an affidavit, Mr. Denny attached only eleven letters from signers who stated that they wanted their names withdrawn from the FIT petition.[4]

The circuit court denied the plaintiffs' request for relief, concluding that changed circumstances created by the County Council amendment permitted FIT to decide not to file the petition. The circuit court further concluded that a "significant number" of signers no longer supported FIT's petition. The plaintiffs filed a notice of appeal and requested that the Court of Special Appeals issue an injunction, pending appeal, requiring that the defendant file the petition. On August 10, 1990, the intermediate appellate court, without opinion, denied the plaintiffs' request for injunctive relief pending appeal.

The plaintiffs thereupon filed in this Court a petition for a writ of certiorari which we granted. On August 29, 1990, this Court vacated the circuit court's judgment. We further ordered that the circuit court enter judgment for

---

**3.** As approximately 12,500 signatures had been obtained, 2,500 signers would have to withdraw to make the petition insufficiently supported under Art. XI–A, § 5, of the Maryland Constitution.

**4.** After the petition for a writ of certiorari was filed in this Court, Mr. Denny represented in another affidavit dated August 24, 1990, that after mailing a letter explaining why FIT believed that the petition should not be filed, he received a total of seventy-seven communications by telephone and by mail. According to his affidavit, seventy-six communications supported FIT's action and one opposed it.

the plaintiffs, requiring that the defendant Denny file the petition.

Article XI–A of the Maryland Constitution grants to counties adopting home rule charters the right to govern themselves with respect to various matters. Article XI–A was the result of a "popular demand for increased local autonomy." *Ritchmount Partnership v. Board of Sup'rs,* 283 Md. 48, 56, 388 A.2d 523, 529 (1978). Section 5 of Article XI–A provides that the citizens of a charter county may amend their charter by filing a petition containing a specified number of signatures with the President of the County Council. After setting out the number of signatures necessary to file a petition, Art. XI–A, § 5, states that the petition "shall be filed with ... the President of the County Council" and that the proposed charter amendment "shall be submitted to the voters of the ... County."

The language of Art. XI–A, § 5, clearly contemplates that, when a petition has the requisite number of signatures and therefore is complete, the petition is to be filed and the proposed charter amendment is to be submitted to the voters. *Cf. Barnes v. State, Ex Rel. Pinkney,* 236 Md. 564, 574–575, 204 A.2d 787, 792–793 (1964) (language in Art. XVI of the Constitution which provides for a referendum is mandatory language).

■ A circulator, or group of circulators, has no greater or lesser right of control over the petition than any other signer. *LaFleur, Att'y Gen. v. Frost,* 146 Me. 270, 288, 80 A.2d 407, 416 (1951). Addressing this issue, the Supreme Court of Maine stated in *LaFleur (ibid.):*

"The pressures in the exercise of the initiative and referendum must come upon the City Council and upon the voters, and not upon a group of ten whose sole function is to start the petition. Once this act is accomplished, they become neither more nor less than voters who have signed, and they have neither greater nor less right nor authority than other signers."

■ The circulator of a petition under Art. XI–A, § 5, has an obligation to abide by the representation made to the signers that once enough signatures are obtained, the measure will be placed on the ballot. This obligation is implicit in the act of soliciting signatures for the purpose of having a charter amendment placed on the ballot. In light of the language of Art. XI–A, § 5, the representation by one purporting to act under § 5, made to those signing, is that *if* the requisite number of signatures are obtained the measure will be on the ballot. That implicit pledge was made express in this case when FIT stated in its instructions: "With enough signatures, the proposed Charter Amendment will be submitted to the voters in the November elections." Once the signatures are obtained, the possessors of the petition have a responsibility to the signers to fulfill their promise and complete the ministerial task of filing the petition. *See Tyler v. Secretary of State*, 229 Md. 397, 403, 184 A.2d 101, 104 (1962) ("the one procuring the petitions or circulating them is the agent of the signers").

■ Embodied in Article XI–A, § 5, of the Constitution is the principle that individual citizens of a county will have a direct say in their fundamental law, *i.e.,* their charter. In light of this principle, citizens have a right to sign a petition as well as a right not to sign or to withdraw their names from a petition. The right is an individual one which can only be exercised by the signer. *State ex rel. Tennison v. Coleman*, 34 Neb. 440, 442, 51 N.W. 1025, 1026 (1892); *State ex rel. Hindley v. Superior Ct.*, 70 Wash. 352, 361, 126 P. 920, 923 (1912).

In *State ex rel. Hindley v. Superior Ct., supra,* the Supreme Court of Washington addressed the question of whether a circulator of part of a petition had the right to withdraw the signatures he had collected. The court stated (70 Wash. at 361, 126 P. at 923):

"Some point is made to the effect that, inasmuch as any petitioner can withdraw his name from a petition prior to the time it is acted upon by the council . . ., therefore one who has circulated a part of a petition can withdraw that

part and the names upon it. We cannot so hold. The right to withdraw, like the right to sign, is a personal privilege, and can be exercised only by the person directly concerned."

In *LaFleur, Att'y Gen. v. Frost, supra,* 146 Me. 270, 80 A.2d 407, the Supreme Court of Maine was faced with a question of whether a certain ordinance proposed by the City Council and ratified by the electors was valid under the state ·constitution. The ordinance sought to designate a committee consisting of the original ten signers of a petition to represent all of the signers of that petition. The committee would have "full power and authority to withdraw the petition or to stop further proceedings at any time when, in their sole and exclusive judgment, such action is deemed advisable." 146 Me. at 286, 80 A.2d at 415. In striking down this portion of the ordinance, the court stated (146 Me. at 287, 80 A.2d at 415):

"In principle it is entirely without the intent of the initiative and referendum. If the people, that is, the voters, are to have the power to legislate in municipal affairs, why we may ask should such power be limited to the judgment of the original ten petitioners, or any petitioners, once the petition has been signed by the appropriate number of qualified voters?"

The Court went on to state (*ibid*):

"A system which compels the voter to leave his great rights to legislate, either directly through the initiative or by the people's veto in a referendum, to the mercy of six out of ten individuals may provide a neat and orderly method for the conduct of business, but it cannot be called the initiative and referendum."

■ Although signers have a right to withdraw their names from a petition if they no longer support it, the number of persons withdrawing must bring the number of signatures to less than 10,000 in order to prevent the petition from being filed. As previously discussed, there was no evidence in this case that the number of signers

desiring to withdraw approached 2,500 people. Since the number of signers who wished to withdraw did not bring the total number of signers below 10,000, FIT and its Chairman were required to comply with the purpose of Art. XI–A, § 5, and to file the petition with the President of the Montgomery County Council.[5]

CHASANOW, Judge, dissenting.

Trial judges are literally and figuratively the foundation of the structure called the judicial branch of government. Appellate courts often acknowledge the plight of the trial judge who is forced to make lightening-quick decisions without the luxury of well thought out arguments and well researched briefs. Unfortunately appellate courts do not always recognize the expertise, indeed the almost instinctual ability, that most good trial judges develop to make rapid, sound decisions often with only minimal assistance from the litigants. Trial court decisions are entitled to appropriate deference by appellate courts, especially when, as in the instant case, the appellate court must act quickly with only minimal opportunity for research and briefing by the parties.

In the instant case, this Court did not, as it should have, merely determine whether Judge Mitchell abused his discretion in denying a request for a preliminary injunction. The Court disregarded the decision of the trial judge and, without giving the defendant any opportunity to call witnesses or produce evidence, issued a permanent injunction. It

---

**5.** We do not suggest that there are no circumstances under which a circulating organization, having obtained the requisite signatures for a charter amendment petition under Art. XI–A, would not be required to file the petition. For example, if prior to the filing deadline a court determined that the proposed charter amendment was not proper charter material (see, e.g., *Griffith v. Wakefield,* 298 Md. 381, 470 A.2d 345 (1984); *Cheeks v. Cedlair Corp.,* 287 Md. 595, 415 A.2d 255 (1980)), or determined that the proposed charter amendment was inconsistent with public general law (see, e.g., *Montgomery County v. Board of Elections,* 311 Md. 512, 536 A.2d 641 (1988)), a circulating organization would not be required to file the petition. We hold only that, under the circumstances of the present case, FIT and its Chairman were required to file the petition.

seems to me that, in issuing the permanent injunction in the instant case, this Court either failed to consider or disregarded not only the decision by the trial judge, but also fundamental legal principles.

## I. IRREPARABLE INJURY

Ficker chose to file suit against Denny and FIT seeking injunctive relief rather than a declaratory judgment. In order to be entitled to injunctive relief, Ficker had to prove that *he* would be irreparably injured if the injunction were not granted. This is so because Ficker had not brought a class action, and he did not bring suit on some "representational standing" theory. Further, Rule 2–201 requires that actions be brought by the real parties in interest, not by someone on their behalf. *See* Paul V. Niemeyer and Linda M. Richards, *Maryland Rules Commentary* at 92 (1984). Rule 2–201 does not authorize Ficker to request an injunction on behalf of other signers of the petition. Thus, Ficker had to show that *he* would suffer irreparable injury.

Ficker was the only person who testified in support of the injunction and the only person who attempted to prove why he would be irreparably injured if the petition were not filed.[1] In my view, Ficker failed to satisfy his burden of proof. Ficker testified that he also had collected over 10,000 signatures for a cap amendment petition which was similar to both FIT's and the County Council's cap amendments. His petition was filed, and his proposed charter amendment was to be on the ballot along with the County Council's amendment. Thus, he was already ensured that cap amendments would be before Montgomery County voters in two versions. There was no showing that Ficker

---

1. There were actually four plaintiffs in the injunction suit: Robin Ficker, George E. Sauer, John F. Thomas, and Albert Ceccone. According to Denny's affidavit, Sauer and Ceccone have stated that they are in favor of the Council compromise version of the referendum. No information was presented as to which proposed amendment John F. Thomas favored and how he might have been irreparably injured if the FIT amendment had not been placed on the ballot.

would have been harmed at all, much less irreparably, if the FIT amendment on the same matter with the same purpose did not join the two already on the ballot. Whatever the reasons for Ficker's insistence that the county voters be presented with three similar cap amendments instead of two—I agree with Judge Mitchell: Ficker would not have been irreparably injured if his request for an injunction was denied and FIT's amendment was not placed on the ballot.[2]

Even if we were to assume that the whole class of signers of the FIT petition are plaintiffs in the case, I do not believe irreparable injury was established. Ficker does not dispute Denny's contention that the County Council's amendment was a very similar, if not improved, version of FIT's petition. Denny points out that the difference between the two proposals "is slight" and that both amendments meet the goals of the signers. Judge Mitchell accepted Denny's representation that a great number of signers believed the County Council's amendment "would, in fact, enhance the position that the signers of the FIT petition sought to achieve." The majority apparently concluded that the signers of the FIT petition have a right to have the exact petition they signed placed on the ballot and that Denny has no right to substitute a very similar amendment. I do not believe the signers are irreparably injured by placing a substitute similar amendment on the ballot, especially where placing both on the ballot might cause voter confusion, divide voter support, and probably result in no amendment being enacted.

## II.  DUTY TO FILE PETITION

The holding of the majority is that the sponsor of a

---

**2.** Coincidentally, two years before this round of petitioning, Ficker had collected more than 10,000 signatures for another similar amendment. That petition, however, was not placed on the ballot because Ficker failed to file it until a week after the deadline.

petition for a county charter amendment "ordinarily" [3] must file the petition once the "requisite number of signatures have been obtained." Majority Op. at 628. The apparent authority for this holding is Article XI-A, § 5 of the Maryland Constitution, which provides that the petition "shall be filed with ... the President of the County Council" and "shall be submitted to the voters." It seems to me that the constitutional provision, Article XI-A, § 5, merely specifies *where* petitions "shall be filed"; it is not intended to, and does not, create a *duty* to file. I suspect that there are literally hundreds of statutes or constitutional provisions like the one in the instant case which specify when or where something "shall be filed." One can speculate on the mischief that would result from construing enactments indicating when or where something "shall be filed" as creating an *enforceable duty* that it "shall be filed."

For example, Maryland Code (1974, 1989 Repl.Vol.), Courts & Judicial Proceedings Art., § 5–101 states:

> "A civil action at law *shall be filed* within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced." (Emphasis added).

Based on the majority's reasoning, this statute requires that everyone with a civil cause of action *must* file suit.

My interpretation that Article XI-A,, § 5 does not create any duty to file a petition is further supported by analogous provisions of law. For example, Md.Code (1957, 1990 Repl. Vol.), Art. 33, § 7–1 (the Election Code), provides for nomi-

---

**3.** It is interesting to note that the majority interprets the constitutional language "shall be filed" to mean "ordinarily shall be filed" and points out in a footnote (with examples) that there are some circumstances where a circulator, having obtained 10,000 signatures for a charter amendment, would not be required to file the petition. Majority Op. at 635 n. 5. If the majority is relying on the mandatory "shall be filed" language of the Constitution to create the obligation to file, how can there be exceptions and how can "shall be filed" mean *"ordinarily* shall be filed?" Cf., *State v. In Re Patrick A.,* 312 Md. 482, 490, 540 A.2d 810, 813–14 (1988); *Bright v. Unsat. C. & J. Fund Bd.,* 275 Md. 165, 169, 338 A.2d 248, 251 (1975).

nation of candidates to public office by petition. Section 7–1(b)(2) provides that a candidate "shall file" petitions which are signed by no less than three percent of the registered voters, and § 7–1(c) further provides that such petitions "shall be filed" with the Board of Supervisors of Elections by a specified date. This provision has never been interpreted as requiring the filing of the petitions if a prospective candidate, after securing the signed petitions, decides not to run. Further, this Court has held that, absent an express statutory prohibition, a candidate for office "has a natural or inherent right to ... have his name deleted from the ballot." *Black v. Bd. of Supervisors,* 232 Md. 74, 79, 191 A.2d 580, 582 (1963).

Other courts have held that sponsors have the right to "undo what they have done." *Clark v. Patterson,* 68 Cal.App.3d 329, 137 Cal.Rptr. 275, 279 (1st Dist.1977). In *Clark,* the City's Board of Supervisors voted to place on the ballot a charter amendment. Subsequent to their vote, changed factual circumstances led the Board to withdraw the proposed amendment. In upholding the withdrawal, the court stated:

"Legislative bodies, no less than private individuals or commercial entities, require a measure of flexibility in their dealings and transactions. They, acting as representatives of the people, must have the ability to undo what they have done, given compelling circumstances.... We believe that such an implied power is necessary, as a Board action which was reasonable and necessary when taken, may become unnecessary and harmful by the time of the election for reasons not readily apparent to the electorate."

*Id.* 137 Cal.Rptr. at 279.

In *Robinson v. Armstrong,* 90 Colo. 363, 9 P.2d 481 (1932), petitioners filed a referendum petition which the Colorado Secretary of State determined was "insufficient." Petitioners maintained that their petition was sufficient and sought judicial review of the Secretary of State's decision, but they also sought to withdraw the petition while pursu-

ing judicial review of the petition's sufficiency. The Supreme Court of Colorado held that the petitioners could withdraw the petition, but could not both withdraw the petition and at the same time seek judicial review. The court stated petitioners could

> "ask to withdraw the petition for amendment, and on the secretary's refusal bring mandamus. If the petition be withdrawn, no review can thereafter be prosecuted, because without the petition no court could adjudicate its sufficiency. Once withdrawn, *it passes from official control and may be tampered with, amended, or destroyed."* (Emphasis added).

9 P.2d at 482.

The majority states "[t]he language of Art. XI–A, § 5, clearly contemplates that, when a petition has the requisite number of signatures and therefore is complete, the petition is to be filed...." Majority Op. at 632. I disagree. Circulators of petitions should have discretion to forebear filing "complete" petitions with exactly 10,000 signatures. They should be entitled to, at least, defer filing until they reasonably believe they have 10,000 *valid* (or in this case 10,000 *still valid*) signatures. It is reasonable to assume that, if circulators collect 10,000 signatures, not all of the signers will be registered voters nor all the signatures valid. Some discretion should exist to allow a circulator who, for example, on the filing deadline has collected 10,010 signatures, to determine that there is a reasonable probability that there are less than 10,000 *valid* signatures, and it would be a waste of time and effort to file the petition, attempt to verify the signatures, and ultimately have the petition rejected for insufficient signatures.

The Constitution gave Denny the right to file his amendment petition, and it provided when and where the petition should be filed. The Constitution did not create the obligation that Denny file this petition. Denny and FIT initiated the petition and led the effort to collect the signatures. They ought to have the right to make a good faith decision not to file their petition.

### III.   AGENCY

The majority also relies on *dictum* in *Tyler v. Secretary of State*, 229 Md. 397, 403, 184 A.2d 101, 104 (1962) that "the one procuring the petitions or circulating them is the agent of the signers."  Majority Op. at 632–634.  Even if Denny were the agent for the signers, he would be entitled to rely on agency principles and should not be required to file this petition.

It is basic agency law that where an agent is confronted with an unforeseen situation and the agent cannot conveniently communicate with the principal, then the agent has the implied authority to take such steps as may be deemed reasonably necessary to protect the interests of his principal.

"If a situation arises which the agent reasonably believes was unforeseen by the principal, the agent may have authority to do acts in excess of, or even contrary to his specific instructions if necessary to protect the principal's interests.  If he can communicate with the principal by reasonable means, he should do so.  But if he cannot and the matter appears to call for action in order to prevent the principal from suffering a loss, he has the authority to do what appears to be necessary."  (Footnotes omitted).

Warren A. Seavey, *Handbook of the Law of Agency* § 21 at 40 (1964).

Denny, by his affidavit filed with the court below, established more than ample basis for Judge Mitchell to hold that Denny was relieved of any obligation he might have had as agent of the signers to file the petition.  The County Council members advised FIT that they were initiating a charter amendment that would, as would FIT's amendment, cap property taxes.  Based on the Council's amendment, the FIT steering committee and Denny "firmly and unanimously" believed that not filing the FIT petition would best achieve the "intent of the signers of the petition."  Denny points out that, if two similar ballot questions both providing for property tax caps are on the ballot, "there is a

substantial risk that the vote will be divided and neither will pass, or both will pass, possibly voiding each proposal." Denny also asserts there are additional reasons why the Council's proposed amendment should. be placed on the ballot as a substitute for FIT's petition. One was a potential ambiguity in the FIT proposal which was clarified in the Council proposal. Another was language in the FIT proposed amendment which, though not intended to, might have inadvertently blocked enactment of a highly desirable, proposed district development tax.

For these reasons, Denny believed that the interests of the signers would be best served by not filing FIT's petition, and instead substituting the new alternative Council amendment. Since he could not reasonably communicate with all 12,500 signers, Denny called a meeting of the FIT steering committee. He states in his affidavit that he also consulted, in person or by the telephone, with representatives of supporting civic associations, many individual workers who had been active in gathering petition signatures, and many who had signed the petition. He alleges that "[a]ll were unanimous in favoring the modified 'council' version of our proposed charter amendment and agreed that we should withdraw our original petition." Denny's affidavit further alleges that he "acted faithfully to carry out the intent of those who signed the FIT petition" when he and FIT decided not to file the petition. I believe Judge Mitchell's decision was correct. Even if Denny was the agent of the signers, upon learning that the Council amendment was to be placed on the ballot, Denny was entitled to conclude that he could not reasonably communicate with all 12,500 signers. He was entitled to act on his reasonable belief, confirmed by the nearly unanimous response of the signers he was able to communicate with, that the objectives of "his principals" would be best served by substituting and supporting the new Council amendment.

## IV. FILING DEADLINE—SEPARATION OF POWERS

To realize what was decided by this Court, and how quickly it was decided, it would be helpful to chronologize

the events that led to this Court's precipitous action in the instant case.

7/24/90  Ficker's petition for injunction filed with a request that the summons be returned to Ficker's attorney for service.

7/25/90  Ficker's hearing on his request for an *ex parte* and/or preliminary injunction. Hearing was continued for one week.

8/01/90  Denny files an answer, and a hearing is held on Ficker's request for *ex parte* or preliminary injunction. Judge Mitchell denies Ficker's request for preliminary injunction.

8/08/90  Notice of appeal to the Court of Special Appeals is filed. A motion for injunction pending appeal is also filed.

8/10/90  Court of Special Appeals denies Ficker's request for injunction pending appeal.

8/13/90  DEADLINE FOR FILING CHARTER AMENDMENT PETITIONS

8/16/90  Ficker petitions this Court for a writ of certiorari and for an injunction pending appeal.

8/20/90  This Court issues an order that oral argument "on the petition for certiorari" be set for August 28, 1990 and that "the motion [for injunction pending appeal] shall be granted and the petition to amend the Charter of Montgomery County shall be filed with the Montgomery County Board of Elections forthwith...."

8/22/90  Denny's attorney receives this Court's injunction pending appeal.

8/23/90  Denny complies with this Court's order and files the petition under protest.

8/24/90  Denny's opposition to petition for writ of certiorari is filed.

8/28/90  Hearing on petition for certiorari held.

8/29/90  Order of this Court granting the writ of certiorari, vacating the judgment of the circuit court for Mont-

gomery County, and remanding to that court "with directions that it enter a judgment requiring that the referendum petitions be filed and verified...."

One of the major problems with both the injunction pending appeal as well as the permanent injunction issued by the majority is that they order Denny to file the petition long after the filing deadline has passed. Md.Code (1957, 1990 Repl.Vol.), Art. 33, § 23–1(b) provides that the deadline for filing the amendment petition with the President of the County Council is the second Monday in August, which was August 13, 1990. When the deadline for filing passed, the FIT petition had not been filed. The circuit court, as well as the Court of Special Appeals, had denied preliminary injunctive requests and refused to order that the petition be filed. On August 20, prior to receiving Denny's answer to Ficker's petition for certiorari and motion for injunction pending appeal, this Court ordered a hearing be set to determine whether we should grant certiorari and also granted Ficker's motion for injunction pending appeal. This Court's August 20th order (received by Denny's attorney on August 22), as well as its August 29th order, required Denny to file the petition substantially after the August 13, 1990 filing deadline. Denny complied with this Court's first order the day after its receipt by his attorney; he filed the petition "under protest" on August 23, 1990. I question our authority to order Denny to file the petition after the filing deadline has passed, especially when the President of the County Council and the Board of Supervisors of Elections are not parties to this action. This Court, at least indirectly, ordered two non-parties, the President of the County Council and the Board of Supervisors of Elections, to violate the Election Code filing deadline. The injunction, in effect, forced the President of the County Council to accept a petition filed after the filing deadline. An injunction cannot give State or County officials extra legal powers. See *Air Lift, Ltd. v. Bd. of Co. Comm'rs,* 262 Md. 368, 404, 278 A.2d 244, 262–63 (1971).

## V.  COURT OF APPEALS FACTUAL FINDINGS

In order to grant affirmative relief by way of a permanent injunction, the majority had to have made specific findings of fact that were antithetic to the findings of the trial judge who denied the injunction.

The majority begins by recognizing that if at least 2,500 signers wished to withdraw their names from the petition the petition should not be filed.  They state that "signers have a right to withdraw their names from a petition if they no longer support it, [but] the number of persons withdrawing must bring the number of signatures to less than 10,000 in order to prevent the petition from being filed."  Majority Op. at 634.  In issuing an injunction, the majority not only ignores the trial judge's decision, but also makes its own factual findings that are unsupported by, if not clearly contradicted by, the record.  The trial judge accepted Denny's representation that "a great number of signers" (Denny argued well over 3,000) favored substituting the County Council amendment and, in effect, desired to withdraw their names.  The majority makes its own contrary finding and states "there was no evidence in this case that the number of signers desiring to withdraw approached 2,500 people.  Since the number of signers who wished to withdraw did not bring the total number of signers below 10,000, FIT and its Chairman were required ... to file the petition...."  Majority Op. at 634–635.  To hold that Ficker had met his burden of proof and to find as a fact that "the number of people who wished to withdraw did not bring the total number of signers below 10,000," would require ignoring the trial judge, the record, and the uncontroverted affidavits filed in this case.

According to Denny's affidavits, after determining that the Council amendment would be on the ballot, Denny surveyed many of the approximately 20 organizations that comprised the membership of FIT.  All were unanimous that the petition should be withdrawn.  "Many" workers who circulated the petition were contacted and all were unanimous in favoring withdrawal.  "Many" signers were

contacted and all were unanimous in favoring withdrawal. Denny received no objection from any signers after the published announcement that the petition would not be filed.

Immediately after Judge Mitchell denied Ficker's request for a preliminary injunction, Denny and FIT sent letters to all 12,500 petition signers. These letters advocated support for the Council amendment and advised the signers that they would not be filing the FIT petition. The letters did not solicit comment on the decision. After the letters were sent, within five days (by August 24, 1990) seventy-seven unsolicited responses were received. Seventy-six of the unsolicited responses favored not filing the petition and only one requested that the petition be filed. If these unsolicited comments are at all indicative of the ratio of petition signers who favored not filing to those who favored filing, 162 would be in favor of filing and 12,338 would agree with Denny that the petition should not be filed.

The majority states, "[i]n an affidavit, Mr. Denny attached only eleven letters from signers who stated that they wanted their names withdrawn from the FIT petition." Majority Op. at 631. What this statement omits is that these letters were all dated July 27 through July 30 and were sent to Denny apparently as the result of publicity about the Ficker suit. All of the letters, generated by the initial publicity about the suit, unanimously supported Denny's position—none urged that the petition be filed and there was no objection from any signer when FIT publicized that the petitions would not be filed. It seems clear to me that there was substantial evidence justifying a conclusion that *at least* one-fifth of the 12,500 signers wished to withdraw.

I might note that the majority places some reliance on the "pledge" FIT made in its instructions that "[w]ith enough signatures, the proposed Charter Amendment will be submitted to the voters in the November elections." Majority Op. at 630. This "pledge," however, was *not* made to or given to *the signers* of the petition—it was contained in the

instructions given to the members of FIT and its component organizations who circulated the petition. Those people do not want this pledge enforced. Denny's affidavit makes it clear that FIT, its steering committee, the component organizations, and the circulators of the petition who were surveyed by Denny were unanimous in not wanting the FIT amendment placed on the ballot once the Council decided to place the Council amendment on the ballot. Denny implored this Court that, if there is *any* doubt about the wishes of the signers, he should be given a brief opportunity to secure the evidence in his defense—if it was deemed necessary, he could easily secure written withdrawals from well over 2,500 signers. The Court should have given him that opportunity—but did not.

## VI. FINAL INJUNCTION

On August 29, 1990, exactly three weeks after Ficker appealed the circuit court's denial of a preliminary injunction, this Court issued a permanent injunction and directed the circuit court to "enter a judgment ... requiring that the ... petitions be filed and verified...." This final injunction was issued before appellate briefs were prepared and even before the record was transmitted from the circuit court. I believe that the action taken by this Court violated basic principles of procedural law and fundamental fairness.

In *Hammond v. Schappi Bus Line*, 275 U.S. 164, 48 S.Ct. 66, 72 L.Ed. 218 (1927), the Supreme Court of the United States reversed a circuit court for granting a final injunction after an appeal from the denial of a preliminary injunction. The Supreme Court stated:

"The appeal was from the interlocutory decree denying the preliminary injunction.... The case was not yet ripe for final disposition by the Court of Appeals. ... Findings and rulings if now made on the basis of the evidence presented at the hearing on the application for the temporary injunction, might be rendered of no avail by the

presentation of other or additional evidence when the case comes on for final hearing."

275 U.S. at 172, 48 S.Ct. at 69, 72 L.Ed. at 221.

Before granting a permanent injunction, we had an obligation to give Denny the reasonable opportunity he requested to prepare his defense and secure the evidence that at least 2,500 signers really did wish to withdraw as well as to obtain 2,500 formal written withdrawals if the Court believed that was necessary.

We must keep in mind that Denny and FIT were convinced that, given even minimal time to prepare for trial, they could prove that the great majority of the 12,500 signatures, certainly well over 2,500 signers, did not want the petition to be filed and wished to withdraw their signatures. Denny was entitled to an opportunity to prove his case. Sometime during the week between Ficker's initial filing and the hearing on the preliminary injunction, Denny was served with notice of the injunction. With an intervening weekend, even assuming it was served the day after the suit was filed, this left Denny less than five working days to draft his affidavit and answer as well as prepare for the hearing. It certainly did not allow him time to attempt to secure written withdrawals, or even try to further survey the 12,500 signers of their petition. Denny believed that he would be given an opportunity, prior to the issuance of any permanent injunction, to prepare and prove his case. After Denny prevailed in the circuit court there was neither the time nor the need to secure formal withdrawals. Two days after Ficker's appeal, the Court of Special Appeals denied Ficker's request for injunction pending appeal, and three days later the filing deadline passed. When this Court the following week issued its injunction pending appeal, Denny had not even had time to file an answer to Ficker's motion for injunction pending appeal. After that injunction was issued, Denny only had a week to prepare for the hearing before us. Denny's attorney indicated that, because all of the sponsoring organizations surveyed unanimously withdrew their support and all of the workers contacted unani-

mously withdrew their support, and because Denny and FIT received no dissenting comments after their publicized decision not to file the petition, they reasonably believed almost none of the 12,500 signers still wanted the petition filed. They publicized the decision not to file the petition and received no objection from the signers. Consequently, they saw no reason, until the Ficker injunction was filed, to expend the time and effort to secure formal signed withdrawals. They had no time to do so after suit was filed.

Before a permanent injunction could be granted, Denny was entitled to an opportunity to prove his defense. He implored this Court for just a "couple of weeks" and proffered that he should be able to easily secure "thousands of withdrawals formally signed." There may be situations where sudden emergencies require this Court to act without giving the parties anything more than minimal opportunity to prepare their case. We are not, in the instant case, faced with one of these situations. The filing deadline did not require immediate action—it passed prior to this Court's taking any action. There could be no prejudice to anyone by giving Denny the couple of weeks he needed to gather proof that over 2,500 signers wished to withdraw. Denny's attorney pointed out that there could be no prejudice in affording him this opportunity prior to any decision whether to issue a permanent injunction. The ballots for the November election could not be printed until after the September 11, 1990 primary results were tabulated and certified. There could be no certification of candidates to the Montgomery County Board of Supervisors of Elections until Monday, October 12, 1990. *See* Art. 33, § 5–3(b). That would allow well over a month in which to set and hold a hearing on whether to issue a final injunction. Fundamental fairness required that Denny should have been given an opportunity to prepare and present his defense.

Maryland Rule BB70 states in part:

"c. *Interlocutory Injunction.*

'Interlocutory injunction' means an injunction granted after an adversary hearing on the propriety thereof, but *before* a determination of the merits of the action.

d. *Final Injunction.*

'Final injunction' means an injunction final or permanent in its nature granted *after* a determination of the merits of the action." (Emphasis added).

In *NCAA v. Johns Hopkins Univ.,* 301 Md. 574, 483 A.2d 1272 (1984), this Court pointed out that "[t]he difference . . . between an interlocutory injunction and a permanent one is whether there has been a determination on the merits of the claim." *Id.* at 580, 483 A.2d at 1275. In the instant case, the lower court only heard the request for an interlocutory injunction. This Court was not requested to issue a permanent injunction, but only an interlocutory injunction pending appeal. There was never any permanent injunction hearing or determination on the merits in the circuit court and no chance for Denny to collect and present evidence that over 2,500 signers wished to withdraw. This Court should not have issued a permanent injunction without giving Denny and FIT a reasonable opportunity to gather evidence and have a full hearing on the merits. *NCAA v. Johns Hopkins, supra.*

## CONCLUSION

I fear that the Court may have created a substantial obstacle to the right of people to petition government for change. Public spirited citizens seeking amendments and referendums might fear what may happen if they begin to circulate petitions. They might be concerned about the possible scope of the "obligation [which] is implicit in the act of soliciting signatures." Majority Op. at 633. Will they, as agent of the signers, be forced to file petitions, which because of subsequent events, they later realize they can no longer support? This Court should not convert Denny's voluntary *right* to petition for change into Denny's involuntary *obligation* to petition for change. I respectfully dissent.

Judge RODOWSKY has authorized me to state that he joins in views expressed in Parts II and III of this dissent.