614 A.2d 553

**PEOPLE'S COUNSEL FOR BALTIMORE COUNTY et al.**

v.

**CROWN DEVELOPMENT CORPORATION.**

No. 41, Sept. Term, 1991.

Court of Appeals of Maryland.

Oct. 27, 1992.

**304**

Peter Max Zimmerman, Deputy People's Counsel (Phyllis Cole Friedman, People's Counsel, J. Carroll Holzer, Holzer, Maher, Demilio & Lee, all on brief), Towson, for petitioners.

L. Robert Evans (Benjamin Bronstein, Michael J. Chomel, Evans, George and Bronstein, all on brief), Towson, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, KARWACKI, and ROBERT M. BELL, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired), Specially Assigned.

McAULIFFE, Judge.

This case involves the subdivision and development process in Baltimore County. At the root of the controversy are questions involving the computation of density standards under the Baltimore County Zoning Regulations and what constitutes a "subdivision tract" within the meaning of § 1B01.2 of those regulations. In the course of considering these questions we briefly analyze the functions and interaction of the County Review Group (CRG) and the Board of Appeals in the plan review process in Baltimore County as it existed at the time. We also consider respondent's claim that People's Counsel should not have been permitted to intervene when this case was before the Circuit Court for Baltimore County.

I.

In 1987, Crown Development Corporation (Crown) filed with the county department of public works a proposed plan for the development of 30.154 acres of land in the Pikesville area of Baltimore County. The plan represented that Crown was the contract purchaser of five parcels of land which it proposed to assemble as a single tract to be known as Woodholme Green. The property was bounded on the north by the Baltimore Beltway and on the west by Woodholme Avenue. Immediately to the west of Woodholme Avenue, and therefore to the west of the proposed subdivision, was an improved tract of land owned by R. Wagers, consisting of 7.04 acres. The plan showed the Wagers tract as an adjacent property in separate ownership, and not included within the plan.

The plan for Woodholme Green was processed in accordance with what were then §§ 22–53 through 22–105 of the Baltimore County Code (1978, 1983 Cum.Supp.).[1] Following receipt of comments from appropriate public agencies and after required publication and notifications, the plan was considered by the CRG on 17 June 1987. The CRG consisted of "the directors of the department of public works and office of planning and zoning or their designated representatives." Section 22–57. In this instance Dwight Little, Chairman of the Department of Public Works, and Gary Kerns, Co–Director of the Office of Planning, comprised the CRG.

At the meeting of the CRG, residents of the area were given an opportunity to comment on the plan. A written summary of the meeting disclosed that negotiations were under way between the developer and interested citizens to reach agreement concerning development of the property,

---

1. This portion of the Baltimore County Code was revised by the enactment of Bill 1–92 by the County Council of Baltimore County, effective March 2, 1992. Development regulations are now found in Title 26 of the Code. Unless otherwise indicated, future references will be to the Code as it existed at times relevant to this case.

and that approval of the plan was to be conditioned on the filing of a written agreement. The CRG issued conditional approval of the plan, and instructed the developer to, among other things: "[p]resent this Plan to the citizens and then formalize agreements. Provide the County with documentation of these agreements.... The plan can then be finally approved." Appended to the summary was a handwritten note identifying the persons or entities who were to become parties to the contemplated agreement.

By written agreement dated 23 September 1987, the developer[2] agreed to certain conditions and restrictions concerning the development of the property, and the local citizens association and ten individuals agreed to not object to the granting of CRG approval of the plan. A copy of the plan, revised as of 17 September 1987, was attached to the agreement as an exhibit. The agreement provided, among other things that:

a. The property may be improved by no more than 132 single family townhouse units, and no other type of new development.

\* \* \* \* \* \*

f. The property shall be developed substantially in accordance with the plat entitled "Woodholme Green, Revised 9/17/87," attached and incorporated as *Exhibit "A"* hereof.

The agreement was apparently submitted to the CRG, and the developer proceeded in accordance with §§ 22–64 through 22–67 with additional matters necessary for recordation of a plat. At some point in time, the developer advised the Department of Public Works that it was chang-

---

**2.** The agreement was signed on behalf of the developer by Woodholme Green Limited Partnership and John W. Shilling Jr. Woodholme Green Limited Partnership had apparently acquired assignments from Crown of the contract rights for the purchase of certain properties involved, and had acquired title to other involved property. Shilling signed as President of Crown and as President of

ing the name of the subdivision from Woodholme Green to Roslyn Station.

Thereafter, on 10 December 1988, Crown and an entity known as NV Land filed a proposed plan for development of the 7.04 acre tract lying to the west of Woodholme Avenue, which we have formerly referred to as the Wagers Tract. The plan called for construction of 48 condominium units, and the subdivision was to be known as "Roslyn Station Section II." Density calculations submitted with the plan showed that the 7.04 acres would support the erection of only 38.72 units. To make up for the shortfall in allowable density, the applicants proposed to utilize density units that it represented were "available" from the earlier Woodholme Green site. The applicants' theory was that Woodholme Green had an original density development potential of 167 units, of which only 133 had been used, and that § 1B01.2 of the Baltimore County Zoning Regulations permitted computation of density by reference to an entire tract, so that some of the unused density from Woodholme Green was available for development of Roslyn Station Section II.

The new plan was considered by the CRG at its meeting of 2 February 1989. On this occasion, the CRG was comprised of C. Thomas Watson, Chairman of the Department of Public Works, and Joe Maranto, Co–Chairman of the Office of Current Planning—two individuals who had not participated in the CRG meeting involving Woodholme Green. The CRG noted the written comment of the zoning office concerning the need for an overall plan covering the original and new sites in order to validate the proposed density shift. The CRG also heard from two residents of the area who had signed the agreement of 23 September 1987, who argued that it would be improper to permit unused density from the original site to be used in connection with this proposed plan. The CRG granted final approval of the plan at the conclusion of the hearing. Alison Tucker, one of the residents of the area who had signed the original agreement, appealed the decision to the County Board of Appeals.

--------

Crown at Woodholme Green, Inc., general partner of Woodholme Green Limited Partnership.

The Board of Appeals received testimony from witnesses for both sides, and considered the record from the CRG. The Board acknowledged that pursuant to § 22–61 of the Baltimore County Code the final action of the CRG was "presumed correct," but the Board nevertheless found that the CRG's decision to allow a transfer of density from the original site to Roslyn Station Section II "was in error and was an arbitrary decision." Finding the decision of the CRG to have been correct in all other respects, the Board approved the plan with the restriction that

[n]o transfer of density units from any other site to this site be permitted and the developer's plan be amended to show only the density that the zoning permits.

Crown appealed to the Circuit Court for Baltimore County. The People's Counsel for Baltimore County, citing a "governmental interest in the implementation of the Baltimore City Zoning Regulations on residential density," sought leave to intervene as an additional appellee. That motion was granted over Crown's objection. The Circuit Court, Judge J. William Hinkel, held that the two tracts had been combined into a single project, and that the allocation of density units to Roslyn Station Section II was therefore neither arbitrary nor illegal. The Court reversed the decision of the Board and ordered reinstatement of the approval of the CRG.

People's Counsel and Alison Tucker appealed to the Court of Special Appeals. Crown filed a cross-appeal, arguing that the Circuit Court should not have permitted the intervention of People's Counsel. The Court of Special Appeals affirmed in an unreported opinion, holding that because the Baltimore County Code would have permitted amendment of the final development plan to unite the two parcels into one tract, the CRG could properly treat the two tracts as one for the purpose of density utilization. We granted the petitions for certiorari filed by People's Counsel and by Alison Tucker, and we reverse.

## II.

█ We hold that the Board of Appeals correctly refused to permit a transfer of density units between two tracts of land that had not been joined as one, and were not treated as a single tract by the plan under consideration. The Baltimore County Zoning Regulations which address utilization of density units within a single subdivision tract are as follows:

> **Application of Maximum Density Standards to Tract in One Zone.** The maximum gross residential density permitted in any one D.R. zone shall control only as applied to the total gross residential acreage within a subdivision tract, and shall not apply to or establish minimum areas of lots created by subdivision within such tract.

B.C.Z.R. § 1B01.2 A.1.

> **Purpose.** Pursuant to the regulations for D.R. zones, a portion of a tract of land may be subdivided for development at a higher residential density than the maximum average density permitted, lessening the permitted density of development on the remainder of the tract; or a portion of the tract may be subdivided for development at less than the maximum average density, thus increasing the density at which the remainder of the tract may be developed. . . .

B.C.Z.R. § 1B01.3 B.1.

The first development plan (Woodholme Green) did not in any manner suggest that it was part of a larger tract. Manifestly, it was not. It purported to cover, and did in fact cover 30.514 acres of land, all to the east of Woodholme Avenue. When the plan was considered by the CRG and by the residents of the area, there was no suggestion that the Wagers Tract, containing 7.04 acres and lying to the west of Woodholme Avenue, was or would ever be involved. Indeed, the developer's representative testified that when the plan for Woodholme Green was submitted, the developer did not have "any connection" with the Wagers property. Accordingly, the nearby property owners who entered into

an agreement with the developer to limit development on the initial tract to 133 units had no reason to believe that they needed to protect themselves against the later utilization of unused density units. As the Board of Appeals later noted, the Baltimore County Zoning Regulations involved in this case do not permit the transfer of density units between tracts; rather, the regulations permit a degree of flexibility, or "clustering," within a single tract. The Woodholme Green plan was given final approval without any amendment to add additional property to that plan. Had there been such an amendment prior to final approval of the plan, the agreement of the parties arguably would have continued to control the density development of all property shown on the plan. The agreement clearly ties the property shown in the plan to the restriction—indeed, the agreement incorporates the plan by reference and refers to the property restricted as the property shown on the plan. Even if this were not so, and the developer had amended his plan before final approval to include the Wagers property so that the unused density might conceivably be used there, the property owners would have had an opportunity to amend the agreement, or to withdraw entirely from the agreement and contest approval of the plan as amended. The developer did not, however, make any attempt to amend the plan before final approval, although, as testimony by the developer's representative later made clear, the developer had signed a contract to purchase the Wagers property before the agreement was signed, and thus before final approval of the plan.

The Baltimore County Code does provide for amendment to an approved plan. Section 22–63 provides that "[a]ny material amendment to an approved plan shall be reviewed and approved in the same manner as the original plan." The addition of a tract of 7.04 acres would certainly constitute a "material amendment." This record does not disclose that any such amendment was made. The plan for Woodholme Green that is before us does not include the Wagers property. It has nowhere been suggested that

Alison Tucker or the other nearby residents were given notice of a proposed amendment to the Woodholme Green plan, or given an opportunity to attend a CRG meeting called for such purpose.

Curiously, at the 1989 meeting of the CRG called to consider the Roslyn Station Section II plan, there was a reference by Joe Maranto, one of two members of the CRG, to a note on "the previously approved CRG plan that proposes 133 units total and the remaining density for future use is indicated as 61 units." Similarly, in the summary of that meeting, the following appears:

> Tom Watson and Joe Maranto examined the agreement between the neighborhood association and the developer, and compared it to the approved CRG plan for Woodholme Green since the agreement specifically was written for that plan. Under the density notes was written:
>
> | | |
> |---|---|
> | Total No. of Units Allowed: | 194 |
> | Total No. of Units Proposed: | 133 |
> | No. of Units Leftover for Future Development: | 61 |
>
> Since the plan referred to stated that there would be future development, the agreement has not been violated in their opinion.

Perhaps based on these references, Judge Hinkel found:

> Prior to this [February 2, 1989] CRG meeting, there had been approval of an amended plan treating the combined tracts as a single project in accordance with BCZR 1 B01.3A.7. The evidence clearly shows that Crown combined Sections I and II into one tract for the purpose of developing them together, thus creating one development tract.

This record does not support that finding—there is no density calculation note similar to that referred to by the CRG on the Woodholme Green plan that is before us. That plan simply shows:

Entire site is zoned D.R. 5.5.

| | | | |
|---|---|---|---|
| Allowed: 30.514 acres @ D.R. 5.5 | = | 167 | units |
| Proposed: single family detached | | 7 | |
| Townhouse units: | | 126 | |
| | | | |
| TOTAL | | 133 | |

Indeed, the Woodholme Green plan considered at the 1987 CRG meeting, and attached as an exhibit to the agreement signed by the parties, could not have borne the density calculation note referred to by Mr. Maranto, because the Wagers property was not included in the plan. No amended plan for Woodholme Green appears in this record. When a representative of the zoning office testified before the Board of Appeals, he reiterated the concern of his office that the CRG require an "overall" plan of both properties before approving the density development proposed for the Wagers property, and he stated to the best of his knowledge that had not been done. We restrict our consideration to the record that is before us, which contains no amended Woodholme Green plan incorporating the Wagers property.

We do not agree with the Court of Special Appeals that because it may be possible to amend the existing plan to include the additional tract, the CRG is justified in treating the two separate tracts as one. The zoning regulations clearly contemplate the existence of a single subdivision tract within which density may be adjusted. When a single plan embracing all the involved property is before the CRG, all parties are fully informed concerning the proposed density and are made aware of any proposed clustering or reservation of initially unused density units. Any subsequent purchaser of property within the subdivision tract is informed by the plan of any increase or decrease of density affecting the property because of approved clustering or underutilization in the remainder of the tract. *See* BCZR 1B01.3 B.1. The developer offering a single plan, whether originally or by amendment, offers the entire plan for comment, and for approval or rejection. What the developer apparently seeks to do in this case is to insulate the first tract from further consideration or attack, while at the

same time using it as a source of additional density development units for an adjoining tract. We agree with the Board of Appeals that the Baltimore County Zoning Regulations do not permit transfer of density units under these circumstances.

## III.

Respondent contends that the Board of Appeals misconstrued its function in this case—that it should have acted in a purely appellate capacity, declining to take testimony and affording the same degree of deference to the decision of the CRG as a court would afford in its review of the action of an administrative body. Petitioners on the other hand, contend that state law requires the Board of Appeals to hear cases of this kind *de novo,* and that provisions of the Baltimore County Charter and the Baltimore County Code to the contrary are invalid.

■ Article 25A, § 5 of the Maryland Code (1957, 1990 Repl.Vol.) enumerates the express powers granted to chartered counties in Maryland. Section 5(U) authorizes the enactment of local laws for the establishment of a county board of appeals and, among other things, for

the decision by the board on petition by any interested person and after notice and opportunity for hearing and on the basis of the record before the board, of such of the following matters arising (either originally or on review of the action of an administrative officer or agency) under any law, ordinance, or regulation of, or subject to amendment or repeal by, the county council, as shall be specified from time to time by such local laws enacted under this subsection: An application for a zoning variation or exception or amendment of a zoning ordinance map; the issuance, renewal, denial, revocation, suspension, annulment, or modification of any license, permit, approval, exemption, waiver, certificate, registration, or other form of permission or any adjudicatory order; and the assessment of any special benefit tax: Provided, that upon any

decision by a county board of appeals it shall file an opinion which shall include a statement of the facts found and the grounds for its decision.

Baltimore County, having availed itself of the power to create a Board of Appeals pursuant to Art. 25A, § 5(U), is obliged to adhere to the requirements of that section. *Hope v. Baltimore County,* 288 Md. 656, 664, 421 A.2d 576 (1980).

Petitioners interpret the requirements of § 5(U) for "a decision ... on the basis of the record before the board" and for "an opinion which shall include a statement of the facts found and the grounds for its decision" to require a *de novo* proceeding in every instance. Accordingly, they argue, § 603 of the Baltimore County Charter, providing that all hearings before the Board of Appeals "shall be heard *de novo,* unless otherwise provided by legislative act of the County Council," and § 22–61 of the Baltimore County Code providing that in any appeal from the CRG to the Board of Appeals

[t]he final action on a plan shall be presumed correct and the person aggrieved shall have the burden of persuasion to show that such action was arbitrary or capricious, procured by fraud, or otherwise illegal

combine to authorize an appeal to the Board of Appeals which is not a *de novo* proceeding, and which is therefore in conflict with state law.

Respondent denies that Art. 25A, § 5(U) mandates an entirely *de novo* proceeding in every case considered by a board of appeals. It argues that the "record before the Board" of which § 5(U) speaks may consist of the record made at another level, in this case before the CRG, and that the requirement for an opinion "which shall include a statement of the facts found" is satisfied by a recitation of facts found at the earlier level which are supported by the record. *Cf. Harford County v. Preston,* 322 Md. 493, 505, 588 A.2d 772 (1991). Respondent cites *Miller v. Forty West Builders,* 62 Md.App. 320, 325–26, 489 A.2d 76 (1985), as having approved the standard of review established by § 22–61,

but we note that the question of possible conflict of the County Charter or § 22–61 with state law was not considered in that case.

In the view we take of this case, the action of the Board of Appeals is sustainable whether the proceeding was *de novo* or was restricted to the record below. If a *de novo*, or partially *de novo* proceeding was authorized, the Board was correct for the reasons already stated. And, if the consideration of the Board was limited to the record made before the CRG, the same result obtains because that record discloses as well the impermissible transfer of density units in this case.

■ Moreover, we think the Board correctly interpreted the meaning of § 22–61 in this case, and that the procedure it followed is not in conflict with express powers granted by the State. The Board properly considered the record made by the CRG. It also afforded deference to the decision of the CRG as required by § 22–61—a deference we do not find in conflict with the requirements of Art. 25A, § 5(U). Finally, the Board exercised its discretion to receive additional evidence bearing on matters that were before the CRG—a procedure that we find consistent with § 22–61 and certainly not at variance with the Express Powers Act.

There is nothing in § 22–61 that precludes the receipt of additional evidence. As Judge Alpert pointed out for the Court of Special Appeals in *Boehm v. Anne Arundel County*, 54 Md.App. 497, 509–11, 459 A.2d 590 (1983), the meaning of *de novo* in administrative law is elastic and varies with the circumstances. Because the Board did receive additional evidence in this case, we need not address the question of whether or under what circumstances a board of appeals' refusal to hear additional evidence might run afoul of the requirement of § 5(U) for "opportunity for hearing," or of other requirements of that section, or of the

requirements of due process of law.[3]

## IV.

■ Finally, respondent argues that the People's Counsel for Baltimore County should not have been permitted to intervene at the circuit court level. Respondent does not, however, suggest how the presence of People's Counsel has prejudiced it. Alison Tucker was a proper party before the circuit court, and had standing to appeal to the Court of Special Appeals and to petition this Court for certiorari. Accordingly, the presence of People's Counsel was not required to obtain appellate review at any level in this case. *See Sugarloaf v. Waste Disposal*, 323 Md. 641, 650 n. 6, 594 A.2d 1115 (1991), and *Board v. Haberlin*, 320 Md. 399, 404, 578 A.2d 215 (1990) ("[w]here there exists a party having standing to bring an action ... we shall not ordinarily inquire as to whether another party on the same side also has standing.").

■ In any event, the circuit court did not err in permitting intervention. People's Counsel has been given a broad charge to protect the public interest in zoning and related matters. *See* Baltimore County Charter § 524.1. Density regulation is an important part of the zoning process. *West Mont. Ass'n v. MNCP & P Com'n*, 309 Md. 183, 194, 522 A.2d 1328 (1987). Although participation in the development plan process may often be outside the intended ambit of People's Counsel's authority, where protection against a violation of a density regulation is involved, People's Counsel has a legitimate interest.

---

**3.** We note in passing that the Baltimore County Council has significantly revamped the procedure for consideration of development plans. Under the revised procedure, interested persons may participate in a community input meeting, after which a hearing is held by a hearing officer. The decision of the hearing officer may be appealed to the Board of Appeals, which may decide the case on the record made by the hearing officer or, in its discretion, may receive additional evidence. A limited scope of review by the Board of Appeals is mandated. Bill No. 1–92, effective March 2, 1992.

# 318

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.