80 A.3d 686

**FRATERNAL ORDER OF POLICE LODGE 35, et al.**

v.

**MONTGOMERY COUNTY, Maryland, et al.**

**No. 132, Sept. Term, 2011.**

Court of Appeals of Maryland.

Dec. 2, 2013.

2

Francis J. Collins (David Gray Wright and Patricia A. Ramudo of Kahn, Smith & Collins, P.A., Baltimore, MD), on brief, for Appellants/Cross–Appellees.

Jonathan S. Shurberg (Jonathan S. Shurberg, P.C., Silver Spring, MD), on brief, for Appellees/Cross–Appellants.

Karen L. Federman Henry, Division Chief (Marc P. Hansen, Co. Atty., Erin Ashbarry, Associate County Attorney, and Silvia C. Kinch, Associate County Attorney, Office of County Attorney, Rockville, MD), on brief, for Appellees/Cross–Appellants.

Argued before: BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD and BELL,* JJ.

---

\* Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

BELL, C.J. (Retired).

In this case, the issue for decision is whether all of the signatures of registered voters collected by an affiant, who, in completing his affidavit to an election referendum petition, provided partially incorrect zip code information, are, for that reason, invalidated. We hold that they are not.

Similar to the general collective bargaining law for County employees, Montgomery, Md., Code §§ 33–101 to 33–112, the collective bargaining law for police department employees, Montgomery, Md., Code §§ 33–75 to 33–85, requires the Montgomery County Executive ("Executive") to bargain over wages, benefits, and working conditions. On July 19, 2011, the Montgomery County Council passed Bill 18–11 [1] to amend Section 33–80(a)(7) of the Montgomery County Code. Section 33–80(a), which prescribes the scope of County collective bargaining with its police department union, provided, before its amendment:

"*Collective bargaining.*

"(a) *Duty to bargain; matters subject to bargaining.* A certified employee organization and the employer must bargain collectively on the following subjects:

"(1) Salary and wages, provided, however, that salaries and wages shall be uniform for all employees in the same classification;

"(2) Pension and retirement benefits for active employees only;

"(3) Employee benefits such as, but not limited to, insurance, leave, holidays and vacation;

"(4) Hours and working conditions, including the availability and use of personal patrol vehicles;

"(5) Provisions for the orderly processing and settlement of grievances concerning the interpretation and implementation of the collective bargaining agreement, which

---

1. Bill No. 18–11 amended Montgomery, Md. Personnel and Human Resources Ch. 33, §§ 33–80 and 33–81.

may include binding third party arbitration and provisions for exclusivity of forum;

"(6) Matters affecting the health and safety of employees; and

"(7) The effect on employees of the employer's exercise of rights listed in subsection (b)."

Montgomery, Md., Code § 33–80(a) (2007). Section 33–80(b), on the other hand, delineates certain "rights" of the Executive that cannot be impaired through police collective bargaining. It provides, in pertinent part:

"*Employer rights.*

"This article and any agreement pursuant hereto shall not impair the right and responsibility of the employer.

"(1) To determine the overall budget and mission of the employer and any agency of county government;

"(2) To maintain and improve the efficiency and effectiveness of operations;

"(3) To determine the services to be rendered and the operations to be performed;

"(4) To determine the overall organizational structure, methods, processes, means, job classifications or personnel by which operations are to be conducted and the location of facilities;

"(5) To direct or supervise employees;

"(6) To hire, select and establish the standards governing promotion of employees and to classify positions;

"(7) To relieve employees from duties because of lack of work or funds, or under conditions when the employer determines continued work would be inefficient or nonproductive;

"(8) To make and enforce rules and regulations not inconsistent with this law or a collective bargaining agreement;

"(9) To take actions to carry out the mission of government in situations of emergency;

"(10) To transfer, assign and schedule employees."

Montgomery, Md., Code § 33–80(b) (2011).

Prior to the enactment of Bill 18–11, Section 33–80(a)(7), which required "effects collective bargaining," *i.e.*, that the Executive bargain with a certified employee group over the "effect on employees of the employer's exercise of rights listed in [Section 33–80](b)," restricted the free and unfettered exercise of the Executive's rights. Thus, for example, § 33–80(b)(4) may have granted the Executive the right to "determine the overall ... methods, processes, means ... by which operations are to be conducted," but prior to the enactment of Bill 18–11, if the Executive wanted to install video cameras in police cruisers, or distribute new public safety equipment, Section 33–80(a)(7) required him to bargain with the police union over how and when the initiative would be implemented, giving the police union, in effect, a veto-like restriction over the exercise of the Executive's powers under Section 33–80(b).

Bill 18–11 was enacted to prevent police unions from using effects bargaining to hinder the implementation of Executive initiatives made pursuant to Section 33–80(b). Upon its enactment, effects bargaining was limited to situations where an Executive initiative enacted under Section 33–80(b) results in the loss of police jobs. Section 33–80(a)(7) provided after its passage:

"(a) Duty to bargain; matters subject to bargaining. A certified employee organization and the employer must bargain collectively on the following subjects:

\* \* \*

"(7) *Amelioration of the effect on employees when the employer's exercise of rights listed in subsection (b) causes a loss of existing jobs in the unit.*"

Montgomery, Md., Code § 33–80(a) (2011) (emphasis added).

Fraternal Order of Police, Lodge 35 ("FOP 35"), in response to the passage of Bill 18–11, initiated a petition drive ("the Petition") to place the bill on the November 4, 2012 ballot for voter referendum. To do so, pursuant to Montgomery County

Charter § 114 [2] and consistent with Article 11–F, Section 7 of the Maryland Constitution,[3] FOP 35 was required to obtain approximately 30,000 signatures. FOP 35 engaged the services of a California and Michigan based company, which specialized in gathering signatures for petition drives, to assist in gathering the required signatures. Through the company's efforts, FOP 35 collected 48,935 signatures in Montgomery County. Those signatures were timely submitted to the Montgomery County Board of Elections ("MCBE") for verification and validation.

Each petition page submitted to the Board, as required by Maryland Code (2003, 2010 Repl.Vol.) § 6–201(c) of the Election Law Article ("EL")[4] contained, among other things, a

---

**2.** Montgomery County Charter § 114 provides that legislation enacted by the County Council shall be submitted to a referendum of the voters upon petition of 5% of the qualified voters of the County.

**3.** Md. Const. Art. 11–F, § 7 provides:

"Any action of a code county in the enactment, amendment, or repeal of a public local law is subject to a referendum of the voters in the county, as in this section provided. The enactment, amendment, or repeal shall be effective unless a petition of the registered voters of the county requires that it be submitted to a referendum of the voters in the county. The General Assembly shall amplify the provisions of this section by general law in any manner not inconsistent with this Article, except that in any event the number of signatures required on such a petition shall not be fewer than five percentum (5%) of the voters in a county registered for county and State elections."

**4.** Maryland Code (2003, 2010 Repl.Vol.) § 6–201 of the Election Law Article ("EL") provides, in relevant part:

"Content of petitions
"*Signature page*
"(c) Each signature page shall contain:
 "(1) a description of the subject and purpose of the petition, conforming to the requirements of regulations;
 "(2) if the petition seeks to place a question on the ballot, either:
 "(i) a fair and accurate summary of the substantive provisions of the proposal; or
 "(ii) the full text of the proposal;
 "(3) a statement, to which each signer subscribes, that:
 "(i) the signer supports the purpose of that petition process; and
 "(ii) based on the signer's information and belief, the signer is a registered voter in the county specified on the page and is eligible to have his or her signature counted;

copy of Council Bill 18–11, spaces for signatures, printed names, and signer addresses and, at the foot, the affidavit of the circulator. The circulator's affidavit was in the form of, and contained the statements required by, EL § 6–204,[5] CO-MAR 33.06.03.07,[6] and COMAR 33.06.03.08.[7] It provided, in part:

> "(4) spaces for signatures and the required information relating to the signers;
> "(5) a space for the name of the county in which each of the signers of that page is a registered voter;
> "(6) a space for the required affidavit made and executed by the circulator; and
> "(7) any other information required by regulation."

5. EL § 6–204 provides:

"Circulators and affidavit of circulator

"*In general*

"(a) Each signature page shall contain an affidavit made and execut-ed by the individual in whose presence all of the signatures on that page were affixed and who observed each of those signatures being affixed.

"*Requirements of affidavit*

"(b) The affidavit shall contain the statements, required by regula-tion, designed to assure the validity of the signatures and the fairness of the petition process.

"*Age of circulator*

"(c) A circulator must be at least 18 years old at the time any of the signatures covered by the affidavit are affixed."

6. COMAR 33.06.03.07 provides:

"Circulator Identification.

"A. Identification Required. Each signature page shall include an identification of an individual circulator, as required by this regula-tion.

"B. Information to Be Provided. The identification of the circulator shall include that individual's:

"(1) Printed or typed name;

"(2) Residence address, including house number, street name, apartment number (if applicable), town, and ZIP code; and

"(3) Telephone number."

7. COMAR 33.06.03.08 provides:

"Circulator's Signed and Dated Affidavit.

"A. Affidavit Required. Each signature page shall include an affida-vit to be signed and dated by the circulator, as required by:

"(1) Election Law Article, § 6–204(a), Annotated Code of Mary-land; and

"(2) This regulation.

*"Circulator's Affidavit:* Under the penalties of perjury, I swear (or affirm) that: (a) I was at least 18 years old when each signature was obtained; (b) the information given to identify me is true and correct; (c) I personally observed each signer as he or she signed this page; and (d) to the best of my knowledge and belief: (i) all signatures on this page are genuine; and (ii) all signers are registered voters of Montgomery County, Maryland. I made available to each signer a copy of the entire bill on the reverse of this page."

Pursuant to COMAR 33.06.03.07, following the affidavit was also a space for the circulator's name, signature, telephone number, and address, including city, state, and zip code.

Two circulators, Christopher Head ("Head") and Jesse Rowe ("Rowe"), misstated the zip codes for their addresses by one or two digits on each page that they signed. Head provided as his address: 1229 Richland Avenue, Kalamazoo, Michigan 49008. Although "49008" was a valid Michigan zip code, the actual zip code for that area of Kalamazoo was 49006. Rowe provided as his address: 1405 Upland Drive, Kalamazoo, Michigan 49004. Again, although a valid Michigan zip code, the actual zip code for his address was 49048. Head submitted 1,019 pages with his error, pages that contained 3,392 signatures. Rowe submitted 942 pages with his error, pages that contained 2,744 signatures.

Despite the incorrect zip codes in the circulator affidavits, the MCBE checked each signature and certified that 34,828 of the 48,935 signatures were those of registered voters of Montgomery County, approximately 4,600 signatures more than

"B. Scope and Tenor. The affidavit shall state that:
"(1) All of the information given by the circulator under Regulation .07 of this chapter is true and correct;
"(2) The circulator was 18 years old or older when each signature was affixed to the page;
"(3) The circulator personally observed each signer as the page was signed; and
"(4) To the best of the circulator's knowledge and belief, all:
"(a) Signatures on the petition are genuine, and
"(b) Signers are registered voters in the State."

required by law. In November 2011, the Board announced by letter that Bill 18–11 was certified for placement on the ballot of the November 2012 General Election.

Seeking to prevent the referendum on Bill 18–11, Montgomery County, Maryland, and Steven Farber, the staff director of the County Council and a registered voter of Montgomery County, (collectively "the respondents"), filed, on November 28, 2011, in the Circuit Court for Montgomery County, a complaint [8] against the MCBE, seeking judicial review and declaratory relief pursuant to EL § 6–209(a) and (b).[9] The complaint challenged the MCBE's certification of the Petition, alleging violation of the requirements for petitions prescribed by EL § 6–203.[10]

---

**8.** The original action was docketed as *Montgomery County Maryland and Stephen B. Farber v. Montgomery County Board of Elections.*

**9.** EL § 6–209 provides:
 *"Judicial Review*
 *"In general*
 "(a)(1) A person aggrieved by a determination made under § 6–202, § 6–206, or § 6–208(a)(2) of this subtitle may seek judicial review:
 "(i) in the case of a statewide petition, a petition to refer an enactment of the General Assembly pursuant to Article XVI of the Maryland Constitution, or a petition for a congressional or General Assembly candidacy, in the Circuit Court for Anne Arundel County; or
 "(ii) as to any other petition, in the circuit court for the county in which the petition is filed.
 "(2) The court may grant relief as it considers appropriate to assure the integrity of the electoral process.
 "(3) Judicial review shall be expedited by each court that hears the cause to the extent necessary in consideration of the deadlines established by law.
 *"Declaratory relief*
 "(b) Pursuant to the Maryland Uniform Declaratory Judgments Act and upon the complaint of any registered voter, the circuit court of the county in which a petition has been or will be filed may grant declaratory relief as to any petition with respect to the provisions of this title or other provisions of law."

**10.** EL § 6–203 provides:
 *"In general*
 "(a) To sign a petition, an individual shall:
 "(1) sign the individual's name as it appears on the statewide voter registration list or the individual's surname of registration and at least one full given name and the initials of any other names; and

FOP 35, as proponents of the petition to referendum, having been granted leave to intervene, moved to dismiss the complaint, arguing that the respondents' failed to exhaust available administrative remedies, as well as failed to file timely the administrative record before the MCBE in compliance with Maryland Rule 7–206.[11] The Circuit Court denied the

---

"(2) include the following information, printed or typed, in the spaces provided:
"(i) the signer's name as it was signed;
"(ii) the signer's address;
"(iii) the date of signing; and
"(iv) other information required by regulations adopted by the State Board.
"*Validation and counting of signatures*
"(b) The signature of an individual shall be validated and counted if:
"(1) the requirements of subsection (a) of this section have been satisfied;
"(2) the individual is a registered voter assigned to the county specified on the signature page and, if applicable, in a particular geographic area of the county;
"(3) the individual has not previously signed the same petition;
"(4) the signature is attested by an affidavit appearing on the page on which the signature appears;
"(5) the date accompanying the signature is not later than the date of the affidavit on the page; and
"(6) if applicable, the signature was affixed within the requisite period of time, as specified by law.
"*Removal of signature*
"(c)(1) A signature may be removed:
"(i) by the signer upon written application to the election authority with which the petition will be filed if the application is received by the election authority prior to the filing of that signature; or
"(ii) prior to the filing of that signature, by the circulator who attested to that signature or by the sponsor of the petition, if it is concluded that the signature does not satisfy the requirements of this title.
"(2) A signature removed pursuant to paragraph (1)(ii) of this subsection may not be included in the number of signatures stated on the information page included in the petition."

11. Maryland Rule 7–206 provides, in relevant part:
"(a) *Contents; Expense of Transcript.* The record shall include the transcript of testimony and all exhibits and other papers filed in the agency proceeding, except those papers the parties agree or the court directs may be omitted by written stipulation or order included in the record. If the testimony has been recorded but not transcribed before the filing of the petition for judicial review, the first petitioner,

motions.[12]

---

if required by the agency and unless otherwise ordered by the court
or provided by law, shall pay the expense of transcription, which
shall be taxed as costs and may be apportioned as provided in Rule
2–603. A petitioner who pays the cost of transcription shall file with
the agency a certification of costs, and the agency shall include the
certification in the record.

\* \* \*

"(c) *Time for Transmitting.* Except as otherwise provided by this
Rule, the agency shall transmit to the clerk of the circuit court the
original or a certified copy of the record of its proceedings within 60
days after the agency receives the first petition for judicial review."

12. The Circuit Court also overruled the petitioners' objection to the
respondents' attempt to expand the scope of the court's review beyond
the administrative record of the Montgomery County Board of Elections
("MCBE"), and granted the right to conduct discovery. The petitioners
argue that this was an error. The petitioners cite *Montgomery County
v. Stevens*, 337 Md. 471, 654 A.2d 877 (1995), for the proposition that
"[a] court's role is limited to determining if there is substantial evi-
dence" in the administrative record as a whole "to support the agency's
findings and conclusions, and to determine if the administrative deci-
sion is premised upon an erroneous conclusion of law." *Id.* at 482, 654
A.2d at 882 (quoting *United Parcel v. People's Counsel*, 336 Md. 569,
577, 650 A.2d 226, 230 (1994)). Emphasizing that the MCBE found
valid the minimum number of signatures required to certify Bill 18–11
to appear on the November 2012 ballot, and the Circuit Court based its
invalidation of the MCBE's certification upon consideration of evidence
outside of the MCBE's findings of fact, the petitioners ask that this
Court reinstate the MCBE's administrative decision.

The respondents, in turn, request that this Court affirm the Circuit
Court's decision to conduct de novo review of the validity of the Petition
signatures. The respondents cite *City of Takoma Park v. Citizens for
Decent Government* to assert that once a decision by a board of elections
is challenged in the form of declaratory judgment, a trial court no
longer needs to defer to the agency. 301 Md. 439, 483 A.2d 348 (1984).
The respondents note that EL § 6–209(b) authorizes declaratory relief,
and therefore contend that the Circuit Court was not limited to review
only the MCBE's record.

FOP 35 also moved to dismiss the complaint for failure to adhere to
the rules for judicial review of an agency decision, arguing that the
Circuit Court was limited to determining if there was substantial
evidence in the record to either support the MCBE's decision or to find
the decision was an erroneous conclusion of law. The Circuit Court,
however, rejected that argument, ruling:

"In the instant case, there is no administrative record to review
because the decision being appealed is the Board's certification of a
petition. . . . Therefore, since the court does not have a record to
examine, the court 'must review the agency's decision in the light
most favorable to it' and give respect to the expertise of the agency in

Having abandoned its challenge to the referendum petition under EL § 6–203, the respondents amended their complaint to add another action for declaratory judgment, this one pursuant to the Maryland Uniform Declaratory Judgment Act ("MUDJA"), Md.Code (2006) § 3–401 *et seq.* of the Courts & Judicial Proceedings Article, and continued to prosecute their action on the new theory that the MCBE had unlawfully counted the voters' signatures on the circulation petition pages, in which the zip code provided by a circulator was erroneous. This, they maintained, was a violation of EL § 6–204. On this ground, the respondents filed a motion for summary judgment, in which they argued that thousands of signatures were improperly certified by the MCBE, because affidavits signed by circulators in support of the Petition were incorrect, incomplete, or fraudulent.

The petitioners responded by filing a cross-motion for summary judgment on the ground that the County did not have standing, pursuant to EL § 6–209, to appeal the MCBE's certification.

The Circuit Court granted the respondents' motion for summary judgment. In its opinion, the Circuit Court, relying on *Tyler v. Secretary of State*, 229 Md. 397, 184 A.2d 101 (1962), agreed with the respondents that the petition pages containing circulators' incorrectly recorded zip codes should be rejected. It reasoned that all statutory requirements for both petition signatures and circulator affidavits must be met, noting and emphasizing what we said in Tyler:

"The purpose of the requirement of the affidavit is to give a prima facie presumption of validity to the petition to which

---

its own field. *Board of Physician Quality Assurance* [*v. Banks*, 354 Md. 59], 67–69 [729 A.2d 376, 380–81 (1999) ]."

The respondents' challenge to the MCBE's decision, however, is premised upon an incorrect conclusion of law, for reasons explained below. Errors, such as an incorrect zip code, in the affidavit signed by a petition circulator have an insufficient nexus to the validity of the voters' signatures on the Petition to properly form the basis of a challenge to the MCBE's certification of the Petition. Therefore, we do not address the issue of whether the Circuit Court erred in granting the right to conduct discovery.

it is attached. If it is shown that the affidavit is fraudulent as to all or part of the petition it supports, the prima facie presumption of the validity of the petition must fail."

*Tyler*, 229 Md. at 404, 184 A.2d at 104–05 (internal citations omitted). Accordingly, the Circuit Court ruled that the petition pages containing incorrect information regarding zip codes and addresses were necessarily invalid.

The Circuit Court also granted the petitioner's motion for summary judgment, holding that Montgomery County, Maryland, lacked standing to bring its appeal under both EL § 6–209 and the MUDJA.

■ On July 17, 2012, the petitioners timely filed, in this Court, its petition for writ of certiorari, arguing that the Circuit Court erred in invalidating the certified petition for referendum, and the respondents timely filed a cross-petition for writ of certiorari, seeking review of the Circuit Court ruling that the County lacked standing.[13] We granted both petitions. *Fraternal Order of Police Lodge 35 v. Montgomery County, Maryland*, 427 Md. 381, 47 A.3d 1017 (2012).

---

**13.** The petitioners argue that the Circuit Court correctly found Montgomery County, Maryland, to lack standing under both EL § 6–209 and the Maryland Uniform Declaratory Judgment Act, § 3–401 of the Courts and Judicial Proceedings Article, as it is neither a "registered voter" nor a "person aggrieved." "It 'is a settled principle of Maryland law that, "where there exists a party having standing to bring an action ... we shall not ordinarily inquire as to whether another party on the same side also has standing." ' " *Garner v. Archers Glen Partners, Inc.*, 405 Md. 43, 54, 949 A.2d 639, 645–46 (2008) (quoting *Sugarloaf Citizens' Ass'n v. Dep't of Env't*, 344 Md. 271, 297, 686 A.2d 605, 618 (1996), in turn quoting *People's Counsel v. Crown Dev. Corp.*, 328 Md. 303, 317, 614 A.2d 553, 559–60 (1992)). *See Montgomery County v. Board of Supervisors of the Elections for Montgomery County*, 311 Md. 512, 516 n. 3, 536 A.2d 641, 643 n. 3 (1988); *State's Atty. of Balt. v. City of Balt.*, 274 Md. 597, 602, 337 A.2d 92, 96 (1975). In the present case, Farber had statutory standing, pursuant to EL § 6–209(b), as a registered voter. Therefore, we need not, and do not, address Montgomery County's cross-petition regarding its standing. *See Maryland State Administrative Bd. of Election Laws v. Talbot County*, 316 Md. 332, 342, 558 A.2d 724, 729 (1988) ("Because [co-plaintiff] has standing as a taxpayer, and the case could proceed with [co-plaintiff] as the only plaintiff, we need not determine whether the County also has standing to bring the suit.").

On August 17, 2012, after oral argument, and consideration of the issues, we issued the following order:

"For reasons to be stated in an opinion later to be filed, it is this 17th day of August, 2012,

"ORDERED, by the Court of Appeals of Maryland, a majority of the Court concurring, that the judgment of the Circuit Court for Montgomery County be, and it is hereby, reversed. Costs to be paid by the Appellees. Mandate to issue forthwith[.]"

*Fraternal Order of Police Lodge 35 v. Montgomery County, Maryland,* 427 Md. 522, 50 A.3d 8, 9 (2012). We now provide the reasons for that decision.

█ The issue before us involves the requirements, as prescribed by EL § 6–204, for a circulator affidavit attached to signature pages, signed in support of a ballot referendum initiative. Section 6–204 imposes three requirements on petition circulators with respect to circulation petition affidavits. First, "[e]ach signature page shall contain an affidavit made and executed by the individual in whose presence all of the signatures on that page were affixed and who observed each of those signatures being affixed." Section 6–204(a). Second, the affidavit is to "contain the statements, required by regulation, designed to assure the validity of the signatures and fairness of the petition process." Section 6–204(b). Lastly, "[a] circulator must be at least 18 years old at the time any of the signatures covered by the affidavit are affixed." Section 6–204(c).

Section 6–204(b) provides the State Board of Elections with the authority to promulgate regulations relating to circulators. Those regulations, found in COMAR 33.06.03.07. and 33.06.03.08, provide:

"COMAR 33.06.03.07.B

"The identification of the circulator shall include that individual's:

"(1) ... name;

"(2) Residence address, including ... ZIP code; and

"(3) Telephone number."

"COMAR 33.06.03.08.B

"The affidavit shall state that:

"(1) All of the information given by the circulator under Regulation .07 of this chapter is true and correct;

"(2) The circulator was 18 years old or older . . . ;

"(3) The circulator personally observed each signer as the page was signed; and

"(4) To the best of the circulator's knowledge and belief, all:

 "(a) Signatures on the petition are genuine, and

 "(b) Signers are registered voters in the State."

The petitioners contend that the MCBE acted correctly in accepting petition pages submitted by both Head and Rowe, considering the signatures on those pages as valid and counting them. They note that circulators Head and Rowe, by signing the affidavit, providing their names, telephone numbers, and addresses, all of which were found by the MCBE to be valid, submitted petition pages that complied with EL § 6–204(b). Although Head and Rowe both erred in reporting their zip code, the petitioners argue that this is "an unintentional mistake of no consequence," that the misstatements were not fraudulent and both circulators were identifiable to the MCBE. The petitioners further contend that there is no authority for the proposition that a minor, unintentional and immaterial mistake in an affidavit *requires* the Court to disregard the entire petition.

Additionally, the petitioners challenge the Circuit Court's application of EL § 6–203 as imposing an undue burden on the voters' right to be counted on a petition, in violation of Article I of the Maryland Constitution, Articles 7 and 24 of the Maryland Declaration of Rights, and the First Amendment to the U.S. Constitution. The petitioners characterize the Circuit Court's ruling as demanding "perfection" by a petition circulator. They cite *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 204–05, 119 S.Ct. 636, 648, 142 L.Ed.2d 599, 617–18 (1999), for the proposition that

the Circuit Court erred by placing restrictions on the petition-ing process that are not narrowly tailored to address the legitimate concern of identifying the circulator of a petition page.

The respondents respond that a circulator's affidavit con-taining an incorrect zip code does not satisfy COMAR 33.06.03.07, and by extension EL § 6–204; in the absence of rebuttal evidence, the circulators' failure to accurately com-plete the affidavit constitutes constructive fraud rendering the signatures invalid. The respondents rest their argument en-tirely upon *Tyler v. Secretary of State*, 229 Md. 397, 184 A.2d 101 (1962). They assert that our decision in *Tyler* requires that all signatures conjoined to the inaccurate affidavits must be invalidated because they are a product of fraud.

In *Tyler*, a registered voter opposed a referendum on a bill involving the establishment of new school bus routes, contend-ing, among other things, that at least one of the signers of the referendum petition was not a registered voter of the State and County. *Id.* at 400, 184 A.2d at 102. The opponent further contended that the statement in the accompanying affidavit of the circulator, attesting to the affiant's personal knowledge of the signer's eligibility, was therefore, false and fraudulent and ineligible for certification. *Id.* We framed the issue as:

> "The question raised by this appeal is the effect upon a referendum petition of the falsity, in part, of the statement in the accompanying affidavit of the circulator . . . that the signers of the petition were registered voters of the State and County, as set opposite their names. . . . Whether such falsity amounts to fraud or gives rise to a presumption of fraud depends, we think, upon a determination of the intent behind the language employed in setting out the require-ments of the affidavit."

*Id.* at 401–02, 184 A.2d at 103.

We concluded that an inaccurate circulator affidavit created the presumption of fraud (actual or constructive) because the circulator falsely attested to a fact of which he had a duty to

know. *Id.* at 405, 184 A.2d at 105. In reaching our conclusion, we observed that Maryland at that time was one of the only states that imposed a duty on the affiant to certify, not merely his belief that the attached signatures were valid, but to his personal knowledge in every particular fact or allegation, which is original and does not depend on information or hearsay. *Id.* at 404, 184 A.2d at 105 (citing *Black's Law Dictionary* (3rd ed. 1933)).[14] We concluded that, wherever the affiant failed in this duty, that affiant's submission would be presumed fraudulent, and, in the absence of rebuttal evidence, the petition signatures would be invalidated. *Id.* at 405–06, 184 A.2d at 105–06. We noted that the reason for this was that, while provisions pertaining to ballot referendums are to be liberally construed, a referendum valid on its face carried the drastic effect of suspending legislation designed to correct a particular evil. *Id.* at 402, 184 A.2d at 103–04. As such, the "crux of the matter . . . [is] the falsity of the statement that, of the affiant's own personal knowledge, such persons were registered voters." *Id.* 229 Md. at 404, 184 A.2d at 105. We therefore concluded, in *Tyler*, that each circulator had the duty to execute an affidavit attesting "personal knowledge" that every signatory to the petition was in fact eligible to sign. *Id.* at 405, 184 A.2d at 105.

The respondents take from *Tyler* that the affiants' incorrect zip code information created a presumption of fraud, and that the petitioners have failed to produce evidence to rebut that presumption. The respondents, therefore, conclude that the signatures attached to the affidavits are necessarily invalid.

We disagree. The respondents' analysis fails to consider that Maryland Election Law has changed significantly since *Tyler* was decided. Maryland has since joined the majority of states that do not require that affiants attest to personal knowledge as to the signer's actual voting status. Indeed,

---

**14.** "Personal Knowledge," as it was used in *Tyler*, is defined in Black's Law Dictionary as: "Knowledge of the truth in regard to a particular fact or allegation, which is original, and does not depend on information or hearsay." *Black's Law Dictionary* (3rd ed. 1933).

current Maryland election law places the burden of verifying signatures and counting validated signatures contained in the petition upon the "staff of the election authority," in this case the Montgomery County Board of Elections, not upon the petition circulators. EL § 6–207(a). Rather than attest personal knowledge of the signatory's eligibility to vote, Maryland law now only requires that the petition circulators attest to the best of their knowledge and to their belief that the signatures given are genuine and that the signers are registered voters. The legal analysis underlying *Tyler*'s holding is, therefore, inapplicable to the present case, and for this reason, *Tyler* provides no support for the respondents' argument.

We disagree with the respondents for another reason: we recognize that the purpose of our election law regarding ballot referenda—to allow registered voters to have direct input in their state's democratic processes—is not served by invalidating the already certified signatures of registered voters. The right to sign and to be counted on a petition is found in Article XI–A, § 5 of the Maryland Constitution. In *Maryland Green Party v. Maryland Bd. of Elections*, 377 Md. 127, 151, 832 A.2d 214, 228 (2003), we held that "the right to have one's signature counted on a nominating petition is integral to that political party member's right of suffrage." In *Munsell v. Hennegan*, 182 Md. 15, 22, 31 A.2d 640, 644 (1943), we recognized that voters should be given every opportunity to have their votes counted, and, in that way, their voices heard, and common sense should be employed with regard to such matters. In *Ficker v. Denny*, 326 Md. 626, 633, 606 A.2d 1060, 1063 (1992), we held that "[t]he right [to sign or not to sign a petition] is an individual one which can only be exercised by the signer." In that case, we concluded that a voter had the right to expect and demand that the proponents of a referendum petition file the petition once sufficient signatures were collected. *Id.* at 635, 606 A.2d at 1064. In other words, a petition that contains the requisite number of valid signatures must proceed, and a proponent cannot unilaterally refrain from filing the petition.

Several of our sister jurisdictions have similarly recognized that the voters' right to have their signatures counted on a petition outweighs objections related to immaterial irregularities. For example, the Supreme Court of Pennsylvania upheld the validity of petition signatures whose accompanying affidavit was signed using an incorrect last name. *In re Blair Tp., Blair Cty., Retail Malt and Brewed Beverage Referendum*, 382 Pa. 295, 114 A.2d 148, 149 (1955). Noting that the identity of the circulator, who incorrectly signed her name, was never questioned, the court determined that the objection to the petition should "be ignored and not permitted to prevent a full and free expression of the electorate's will." *Id.*

The Supreme Court of Missouri also emphasized the importance of preserving the voters' right to be counted in an initiative and referendum when it found that minor errors in circulator affidavits are insufficient to invalidate a petition if the underlying petition signatures were shown to be valid and genuine. *United Labor Comm. of Missouri v. Kirkpatrick*, 572 S.W.2d 449, 453–54 (Mo.1978). The court explained that "procedures designed to effectuate these democratic concepts should be liberally construed to avail the voters with every opportunity to exercise these rights. The ability of the voters to get before their fellow voters issues they deem significant should not be thwarted in preference for technical formalities." *Id.* at 454. The court noted that the purpose of the state constitution's provision to the people of the power of initiative and referendum is to allow an issue to be put to a vote before the people if a sufficient number of registered voters deem the issue important. *Id.* at 453. In light of this purpose, the court refused to find fatal an irregularity not specified as fatal by statute, because "[s]uch provisions should be construed so as to make effective the reservation of power by the people." *Id.* at 454 (quoting *State ex rel. Voss v. Davis*, 418 S.W.2d 163, 167 (1967), in turn quoting 28 Am.Jur., Initiative, Referendum and Recall, Sec. 6, p. 439).[15]

---

**15.** Other jurisdictions have held that technical deficiencies in referendum petitions will not invalidate the petitions if they substantially

 There is simply no call among the controlling authorities for invalidating otherwise valid petition signatures in the absence of fraud because a petition circulator failed to dot an "i" or cross a "t". *See Montgomery County Volunteer Fire–Rescue Ass'n v. Montgomery County Bd. of Elections,* 418 Md. 463, 470–71, 15 A.3d 798, 802 (2011). Our laws make it clear that the purpose of attaching the circulator's affidavit to petition signatures is so that the circulator of the petition can be identified, located, and if necessary, served a subpoena. *Id.* at 473–74, 15 A.3d at 804. Having one or two digits of a circulator's zip code misstated does not defeat that purpose. The circulators still could be identified, as the addresses provided were more than adequate for their intended purposes (location and identification of the circulators), and the correct zip code was easily discoverable and available. We therefore hold that minor errors in the circulator affidavit will not invalidate petition signatures that are already certified by the appropriate administrative body. Upon reviewing, de novo, the lower court's conclusion of law, *Maryland Dep't of Health & Mental Hygiene v. Brown,* 177 Md.App. 440, 462, 935 A.2d 1128, 1141 (2007) *aff'd,* 406 Md. 466, 959 A.2d 807 (2008) (citing *Miller v. Comptroller of Maryland,* 398 Md. 272, 282, 920 A.2d 467, 473 (2007)), we reverse the Circuit Court's ruling and uphold the MCBE's decision.

 As noted above, the petitioners' argue that the Circuit Court placed unconstitutional burdens on the voter's right to be counted on a petition. This Court has stated that "nothing is better settled than the principle that courts should not decide constitutional issues unnecessarily." *Comptroller of*

---

comply with statutory and constitutional requirements. For example, in *Hayward Area Planning Assn. v. Superior Court,* the California Court of Appeal for the First Circuit, Division 4, refused to invalidate a petition simply because it failed to print the words 'Referendum Against the Ordinance Passed by the City Council' along the top of each page of the petition, as required by statute. 218 Cal.App.3d 53, 59, 266 Cal.Rptr. 745 (1990). The court determined that since the contents of the petition clarified what the objective of the petition was, the purpose of the heading, to reduce confusion among signers, was substantially achieved. *Id.* at 59–60, 266 Cal.Rptr. 745.

*Treasury v. Crown Cent. Petroleum Corp.*, 52 Md.App. 581, 597, 451 A.2d 347, 355 (1982) (quoting *State v. Raithel*, 285 Md. 478, 484, 404 A.2d 264, 267 (1979)). Therefore, "[e]ven if a constitutional issue is properly raised and decided at the trial level, this Court will not reach the constitutional issue if it is unnecessary to do so." *Robinson v. State*, 404 Md. 208, 217, 946 A.2d 456, 461 (2008) (citing *Burch v. United Cable Television of Baltimore Ltd. Partnership*, 391 Md. 687, 695, 895 A.2d 980, 984–85 (2006)). We see no reason to address this argument by the petitioners, as we have already ruled on statutory grounds.

BATTAGLIA, J., dissents.

BATTAGLIA, J., dissenting.

I respectfully dissent and would affirm the Circuit Court's ruling that an affidavit containing information provided by a circulator that is incorrect is contrary to the clear and unambiguous statutory mandate of Section 6–204(b) of the Election Law Article, Maryland Code (2002, 2010 Repl.Vol.)[1] and COMAR 33.06.03.07.B[2] and, therefore, should be rejected. *See Doe v. Montgomery County Board of Elections*, 406 Md. 697, 962 A.2d 342 (2008). I would not reach the cross-petition

---

1. Section 6–204 of the Election Law Article, Maryland Code (2002, 2010 Repl.Vol.) states:

 (a) *In general.*—Each signature page shall contain an affidavit made and executed by the individual in whose presence all of the signatures on that page were affixed and who observed each of those signatures being affixed.

 (b) *Requirements.*—The affidavit shall contain the statements, required by regulation, designed to assure the validity of the signatures and the fairness of the petition process.

 (c) *Age of circulator.*—A circulator must be at least 18 years old at the time any of the signatures covered by the affidavit are affixed.

2. COMAR 33.06.03.07.B provides:

 B. Information To Be Provided. The identification of the circulator shall include that individual's:

 (1) Printed or typed name;

 (2) Residence address, including house number, street name, apartment number (if applicable), town, and ZIP code; and

 (3) Telephone number.

regarding whether Montgomery County lacked standing, because, as stated by the majority, we need not inquire regarding standing of a co-plaintiff where an existing party has standing.